900 So.2d 168 (2005)
STATE of Louisiana
v.
Tron HUGHES.
No. 2004-KA-1797.
Court of Appeal of Louisiana, Fourth Circuit.
March 16, 2005.
*169 Eddie J. Jordan, Jr., District Attorney, Zata W. Ard, Assistant District Attorney, New Orleans, for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge CHARLES R. JONES, Judge JAMES F. McKAY III, Judge EDWIN A. LOMBARD).
EDWIN A. LOMBARD, Judge.
The principal issue in this case is whether sufficient evidence supports the defendant's conviction for manslaughter, a violation of La.Rev.Stat. 14:31. After review of the record in light of the applicable law, we find that the evidence is insufficient to support the conviction.

Relevant Facts
On August 17, 2002, at approximately 7:30 p.m., Shannon Williams was shot twice in the head in the kitchen of his residence at 14824 Emory Road in New Orleans East. Shortly thereafter, the 911 operator received two calls from Ryan Smith. Smith first declared that he walked up to the open door of a friend's house and an unknown person shot his friend and ran out. In a second call to the 911 operator, Smith stated that he only saw the perpetrator from behind and did not know the identity of the person who shot his friend.

The Investigation
The New Orleans Police Department (NOPD) dispatched officers to the scene in response to the reports of shots fired on Emory Road. Officer Yancy Dixon and his partner, Officer Harry Brown, were the first to arrive and were flagged down by a black male who related that his co-worker, Mervyn Duckworth, took Williams to his residence, saw Williams enter the house with two of three men who were waiting for him, and fled the area after hearing two gunshots. Officer Dixon walked to the front door, announced his presence, and entered the residence where he[1] observed two bullet casings on the floor and found the victim lying on his side in the kitchen (the second room of the house) bleeding from the head. Two shoeboxes, containing a digital scale and a Crown Royal bag, were on the kitchen dinette table. After determining that Williams was unresponsive, Officer Dixon and his partner secured the scene, notified the appropriate authorities, and waited for personnel from the detective division, the coroner's office, and the crime laboratory ("the Crime Lab"), to arrive.
After being notified of the homicide, Detective Bernard Crowden[2] went to the crime scene to take charge of the investigation. He directed the Crime Lab personnel *170 to collect the two bullet casings[3] and the two shoeboxes with their contents,[4] and to dust the front door for fingerprints.[5] Detective Crowden returned to the 7th District police station where Mervyn Duckworth was waiting. In a taped statement, Duckworth stated that he had driven Williams to his house at approximately 7:30 p.m.; that Ryan Smith and two other individuals were waiting for Williams in a burgundy car and one individual was waiting in a white car; that Smith and the individual seated in the front passenger seat of Smith's car got out of the car and went into the house with Williams; that Smith's passenger was carrying a shoebox; and that he heard two gunshots and saw Smith run out of the house. Duckworth identified Smith in a photographic lineup as the man he saw leaving the victim's house immediately after hearing gunshots.[6]
Detective Crowden also interviewed Smith that evening at the police station. Smith stated at Williams' request he accompanied his nephew, Clarence Emilien, and Emilien's friend to Williams' house to buy a car from Williams; that he drove to Williams' house with Emilien and his friend and then followed Williams and Emilien's friend into Williams' house; that Emilien's friend pulled a gun out of a shoebox and shot Williams and he (Smith) ran out into the street; that Emilien's friend ran out of Williams' house and jumped into a white car containing Emilien and another man; and that the white car drove quickly away and he (Smith) ran back into Williams' house to retrieve his car keys before driving home and calling the police. He described Emilien's friend as a little shorter than himself (5'11") with nappy hair and identified Emilien in a photographic lineup.
Detective Crowden obtained a warrant for Emilien on the charge of first degree murder, noting in his contemporaneous report that an unnamed witness reported seeing Emilien, one of the three perpetrators in the offense, flee the vicinity in a white unknown vehicle shortly after the incident, and that "[t]he other male who did the shooting is at large along with the driver of the white vehicle."[7] When Detective Crowden went to Emilien's residence the next afternoon (August 19, 2005), he was advised that Emilien was not at home.[8] Late that evening at approximately *171 11 p.m., Emilien arrived at the police station with his mother. In a taped statement given at 1:15 a.m. on August 20, 2005,[9] Emilien identified Tron Hughes, an acquaintance since childhood, as the third person on the scene and identified Hughes in a photographic lineup. Emilien was arrested as a principal to the 1st degree murder of Williams in violation of La.Rev. Stat. 14:24:30.
Shortly after the arrest of Emilien, Smith was also arrested as an accessory after the fact to the murder and identified Hughes in a photographic lineup as the person who shot Williams. Detective Crowden arrested Hughes several days later on August 27, 2002, at the Greyhound Amtrak Station when Hughes approached him, working a paid detail in full uniform and sitting at the security desk, to ask where he could catch a taxicab. In the search incident to the arrest, Detective Crowden recovered a Houston-New Orleans bus ticket purchased by Donny Minor dated August 26, 2002, and $585.00 in cash. Hughes stated that he was returning home from Texas because his mother called to tell him his face was on the news, that his cousin purchased the bus ticket, and that he planned to turn himself into the police after talking to a lawyer.
Hughes was indicted on October 17, 2002, on the charge of 1st degree murder and entered a plea of not guilty on October 23, 2002. On November 2, 2002, at a hearing on the defendant's motion to suppress, Detective Crowden testified that Smith and Emilien identified Hughes in a photographic lineup but that Duckworth had never been shown a photographic lineup or asked to identify Hughes. Smith also appeared at the hearing, testifying that when Detective Crowden first interviewed him he identified Emilien in a photographic lineup and that he identified Hughes in a photographic lineup shown to him several days later at the time he was arrested as an accessory to the murder.
At an evidentiary hearing on March 14, 2003, Emilien testified that he owned a 40 caliber semi-automatic pistol purchased in 2001, but that the gun had been confiscated by the police in conjunction with a traffic stop. Detective Willie Bickham and Officer Kenny Prepetit of the New Orleans Police Department testified, however, that Emilien was stopped on April 12, 2002, for a traffic violation and arrested on an open warrant from Criminal District Court, that the search of the car incident to the arrest revealed a semi-automatic weapon, but that after ascertaining that the gun was not stolen and was properly registered to Emilien the gun was placed in the trunk of Emilien's vehicle. Sergeant Joe Meisch of the N.O.P.D., Seventh District Narcotics Unit, testified that he arrested Clarence Emilien on March 7, 2002, for possession with intent to distribute cocaine, that no gun was recovered in the search incident to the arrest, and a computer search indicated that the gun registered to Emilien had never been seized and placed in the N.O.P.D. Property Room.
Prior to trial, Emilien and Smith negotiated plea deals with the state in exchange for testifying against Hughes. Emilien *172 pleaded guilty to accessory to first degree murder, as well as a charge for possession of cocaine arising out of a separate incident, and received a probation sentence on both charges. Smith died before trial.

The Trial
At trial, a firearms specialist testified that the bullet fragments recovered during the autopsy of the victim were fired from the same weapon, a 40 caliber semi-automatic pistol, and the bullet casings found at the scene were 40 caliber cartridge cases manufactured by Winchester and fired from a 40 caliber semi-automatic pistol. He was unable to determine the exact make of the gun from which the bullets were fired, but the characteristics of the firing pin eliminated a Glock or some models of Smith & Wesson 40 caliber pistols as the murder weapon.
Detective Crowden acknowledged that there was no physical evidence or witness that placed Hughes at the scene of the murder, that no effort had been made to locate Emilien's 40 caliber pistol, and that only the statements of Emilien and Smith connected Hughes to the murder.[10] Detective Crowden testified that he was unaware of Smith's early statements to the 911 operator[11]
Because he was unavailable for trial, Smith's pretrial motion hearing testimony was read to the jury and the tape of Smith's 911 calls was played for the jury. Smith's testimony included no recitation of the facts of the murder and there was no cross-examination as to the conflicts between his 911 calls, his statements to the police, or his testimony.
Emilien acknowledged his plea agreement with the State in exchange for testifying against Hughes and that he received probation on a guilty plea to accessory to 1st degree murder and possession of cocaine. Emilien testified that at approximately 5 p.m. on the afternoon of the murder, he and Hughes left a back-to-school party in the vicinity of Annette and Robertson Street to go to Williams' house to buy a kilo of cocaine for $20,000.00. Shortly after they arrived at Williams' house, Williams arrived in a truck driven by Duckworth who, according to Emilien, was Williams' cousin and the supplier of the cocaine. Williams got out of the vehicle with a green bucket and went into his house with Hughes but refused to follow through on the drug deal because Hughes was carrying a 357 revolver. Emilien and Hughes left Williams' house but as they were driving away, Williams called Emilien on his cell phone and told him that if Hughes would put the gun away he would do business. In a second call, Williams told Emilien that he wanted to do business through Emilien's uncle, Ryan Smith. After receiving a follow-up call from Smith, Emilien and Hughes drove to the barbershop in the Plaza where Smith worked. Leaving Hughes' car, a white Lumina,[12] in *173 the parking lot of the Plaza, Emilien and Hughes rode with Smith to Williams' house, Hughes sitting in the passenger seat and Emilien sitting in the backseat. They arrived at Williams' house and waited until Duckworth drove up with Williams. Smith and Hughes, carrying a Crown Royal bag in a shoebox, got out of Smith's car and went into the house with Williams while Emilien remained in the car searching for Hughes' scale. Emilien heard gunfire, saw Smith running out of the house, exited the car and ran down the street to a house formerly owned by his aunt where he remained for a few minutes before walking to the bus stop and catching a bus home. Emilien admitted that he owned a 40 caliber Taurus pistol, but claimed that the N.O.P.D. seized it on March 7, 2002, in conjunction with a traffic stop and his arrest on an outstanding warrant.
Duckworth testified that Williams was an employee in his landscaping business and, although he knew him "extremely well" he was not aware that he dealt in drugs. On the afternoon of the murder, Williams used his truck for various errands and then asked for a ride home. Duckworth drove to Williams' house and pulled behind a red or maroon Oldsmobile blocking the driveway.[13] Two men exited the car, the driver and the front seat passenger, who was carrying a shoebox, and the third person remained seated in the backseat of the car. Duckworth recognized the driver (Smith), who he described as 5'10" with a slim build, as someone he had previously met at Williams house, but did not recognize the passenger who, according to Duckworth, was about the same size as Smith, but thinner.[14] Duckworth heard the first gunshot as he was backing his vehicle to leave. He stopped, rolled down his window, and heard a second gunshot as the driver of the Oldsmobile (Smith) ran out of the house waving his empty hands in the air. Duckworth quickly drove away and then called another employee to check on Williams. Duckworth called family members to meet him at the 7th District Police Station and several hours later he was interviewed by Detective Crowden. Duckworth identified Smith in a photographic lineup as the driver of the Oldsmobile, but was never asked to identify either Hughes or Emilien or questioned as to whether he saw either man at the crime scene.
Consistent with their pretrial hearing testimony, Detective Bickham and Officer Prepetit testified that Emilien's 40 caliber gun had not been seized in conjunction with the traffic stop on March 7, 2002, and Sergeant Meisch testified that there was no record of the 40 caliber semi-automatic pistol registered Emilien ever being seized *174 by the N.O.P.D. police or placed in the N.O.P.D. property room.
Torrey Lewis, the defendant's cousin, testified that on August 17, 2002, Hughes came to his snowball stand at St. Bernard and Robertson several times and the, because the stand had been very busy that day due to the back-to-school party in the neighborhood, helped him clean up the stand between 7 and 8 p.m. that evening after closing.
Jason Williams, Emilien's attorney, testified that Emilien was initially charged with first-degree murder and charged with possession of cocaine in a separate case but that on November 6, 2002, in exchange for guilty pleas to accessory after the fact and simple possession of cocaine he was sentenced concurrently to three years suspended and three years active probation.
After a two-day trial (May 5-6, 2003), the jury found Hughes guilty of manslaughter. Hughes was sentenced to 20 years at hard labor without benefit of probation, parole, or suspension of sentence

Discussion
On appeal, Hughes raises two assignments of error: (1) the evidence is insufficient to support the conviction for manslaughter; and (2) the sentence is unconstitutionally excessive.
In any criminal prosecution, the state must sustain the heavy burden of proving every element of the crime charged beyond a reasonable doubt. La. Rev.Stat. 15:439; State v. Hollingsworth, 337 So.2d 461 (La.1976); see also, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, (1970). When a key issue at trial is whether the defendant was the person who committed the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. State v. Bright, 98-0398 p. 22 (La.4/11/2000), 776 So.2d 1134; State v. Smith, 430 So.2d 31, 45 (La.1983); see also State v. Brady, 414 So.2d 364, 365 (La. 1982); State v. Long, 408 So.2d 1221, 1227 (La.1982). The reasonable doubt standard is based upon a fundamental precept in our society that it is far worse to convict an innocent person than to let a guilty person go free. In re Winship, 397 U.S. at 368, 90 S.Ct. 1068 (Harlan, J., concurring).
The standard of review in evaluating the sufficiency of the evidence to support a conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). Accordingly, in reviewing the evidence, the whole record must be considered and "the reviewing court may not disregard its duty under due process of law as interpreted by Jackson v. Virginia simply because the record contains testimony which tends to support each fact necessary to constitute the crime." State v. Mussall, 523 So.2d 1305, 1311 (La.1988). "If the court finds that no rational trier of fact viewing all the evidence from a rational pro-prosecution standpoint could have found guilty beyond a reasonable doubt, the conviction cannot stand constitutionally. Id. (emphasis added.). The reviewing court may not second-guess the fact-finders credibility determinations[15], State ex rel. Graffagnino v. *175 King, 436 So.2d 559 (La.1983), but must be mindful that the touchstone of Jackson v. Virginia is rationality and, accordingly, that irrational decisions to convict must be overturned. State v. Bright, p. 22, 776 So.2d at 1147; State v. Mussall, 523 So.2d 1305, 1310 (La.1988). In summary, the court may not substitute its judgment of what the verdict should be for that of the jury, but at the same time "the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt." Mussall, 523 So.2d at 1311 (quoting 2 C. Wright, Federal Practice & Procedure, Criminal 2d, § 467, at 660-661 & n. 23).
Applying these precepts to the present case, we conclude that any rational trier of fact, after viewing all the evidence favorably to the prosecution, necessarily must have a reasonable doubt as to Hughes guilt. The only evidence connecting Hughes to the crime comes from Emilien and Smith. Smith, however, initially told the 911 operator that he only saw the gunman from the back and was unable to describe him; he identified Hughes as the gunman only after his nephew was arrested and he himself was charged in the murder. Likewise, Emilien identified Hughes as the gunman only after a warrant was issued for his arrest on the murder charge and in his second statement to police at the time of his arrest. Moreover, even though Emilien identified Hughes as the gunman, he testified that Hughes was carrying a 357 revolver, a gun which was not the murder weapon in this case. Emilien acknowledged that he owned a 40 caliber semi-automatic, the same type gun used in the murder, and that he had purchased Winchester bullets at the time he purchased the gun. Emilien, however, clearly lied about the gun being confiscated by the NOPD prior to the murder. Although bullet casings, shoeboxes, and a scale were retrieved from the crime scene, no physical evidence connects Hughes to the crime scene. Duckworth, the only eyewitness unrelated to the two witnesses (Emilien and Smith) involved in the murder, testified that the person accompanying Smith into the house with Williams was about the same size as Smith; Duckworth described Smith as 5'10" and police reports indicate that Hughes is 5'6", noticeably smaller than Smith.[16] Duckworth did not identify Hughes as the individual who went into the house with Smith and Williams. Given these facts, we find that the prosecution failed to sustain its heavy burden and that the evidence is not sufficient to persuade a rational trier of fact beyond a reasonable doubt that the defendant was indeed the perpetrator.

Conclusion
Viewing the evidence in the light most favorable to the prosecution, no rational *176 fact finder could find that an essential element of the crime, the identity of the perpetrator, was proven beyond a reasonable doubt. The defendants conviction and sentence[17] are therefore reversed. Tron Hughes is ordered discharged from this offense.
REVERSED; DEFENDANT DISCHARGED.
McKAY, J., dissents with reasons.
McKAY, J., dissents with reasons.
I respectfully dissent from the majority ruling reversing the conviction of the defendant and finding that an essential element of the crime, the identity of the perpetrator, was not proven beyond a reasonable doubt, for the following reason.
As noted in State v. Tumblin, XXXX-XXXX, pp. 4-5 (La.App. 4 Cir. 9/17/03), 857 So.2d 1045, 1048-49:
In reviewing the sufficiency of the evidence to support a conviction, the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Jackson standard "preserves the role of the jury as the fact finder in the case but it does not allow jurors 'to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 429. Nonetheless, credibility calls are within the fact-finder's discretion and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
Under the Jackson standard, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Jacobs, 504 So.2d 817, 820 (La.1987). When circumstantial evidence forms the basis for the conviction, the totality of such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. However, the circumstantial evidence rule is not a separate test from the Jackson standard; La. R.S. 15:438 is simply "an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found defendant guilty beyond a reasonable doubt." State v. Wright, 445 So.2d 1198, 1201 (La.1984). Ultimately, the totality of the evidence must be sufficient to satisfy a rational trier of fact that the defendant is guilty beyond a reasonable doubt. State v. Sutton, 436 So.2d 471 (La.1983). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Ferguson[Furgerson], 34,344 (La.App. 2 Cir. 3/2/01), 781 So.2d 1268, writ den. XXXX-XXXX (La.3/22/02), 811 So.2d 921. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. Id.

(emphasis added)
*177 Accomplice testimony was discussed in State v. Willis, 36,759, p. 7 (La.App. 2 Cir. 4/9/03), 843 So.2d 592, 597, citing State v. Dunn, 30,560, p. 8 (La.App. 2 Cir. 2/25/98), 709 So.2d 852, 857:
As a general principle of Louisiana law, a conviction can be sustained on the uncorroborated testimony of a purported accomplice. However, when the state's case relies upon the uncorroborated testimony of a purported accomplice, the trial judge (or jury) should treat such testimony with great caution. This great caution is not required if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation. (Citations omitted).
See also State v. Jackson, 31,433, p. 6 (La.App. 2 Cir. 1/20/99), 726 So.2d 1061, 1067.
In Dunn the defendant Tonya Dunn was convicted of an aggravated battery. The victim was attacked by several women who had been told that he had molested one of their young relatives. The defendant admitted striking the victim with her hands, and then leaving the scene when her aunts Carolyn and Geneva Dunn appeared. Carolyn Dunn was also tried and convicted for the same offense, and she was the only witness to testify at the defendant's trial to inculpate the defendant, and did so under a grant of immunity for perjury. Carolyn Dunn's testimony was characterized by the appellate court as inconsistent with that of other witnesses. Viewing the evidence in the light most favorable to the State, the appellate court concluded that no rational juror could rely on the uncorroborated testimony of Carolyn Dunn to convict the defendant and reversed the conviction.
In Jackson, the court distinguished Dunn because there was evidence which tended to corroborate the accomplice's testimony. The defendant in Jackson committed an armed robbery of a restaurant when it was preparing to close for the night. He and another man, both masked, entered the restaurant at 2:15 a.m. when an employee, Joseph Young, opened the back door to put out the trash out. Because the robbers were masked, none of the restaurant employees could identify them. Furthermore, no fingerprint evidence was recovered. However, the police learned that another employee had alerted the manager a few weeks before that a group of people had been planning on robbing the restaurant at opening; apparently security precautions had been put in place without the police being alerted. The police investigation resulted in information that several men, including Joseph Young and the defendant, had been at the defendant's home one night when the robbery was planned. Another one of the restaurant employees, a man named Fuller, had also been present, and he was the one who had alerted the restaurant generally that there might be a robbery. Ultimately, one of the restaurant employees pointed out the defendant in the restaurant parking lot as one of the people involved in the planning of the robbery. From there, the police went to interview him at his home and found Young at the defendant's residence. Young then confessed to the police that the defendant had been one of the masked men who perpetrated the robbery and admitted that he had let them into the building; he stated he did not know the identity of the second robber. Young turned over two guns and a portion of the alleged robbery proceeds to the police and testified at trial to his and the defendant's participation. On appeal, the defendant's conviction was affirmed. The court conceded that Young had lied various times about his own and the defendant's participation and that there was no physical evidence tying the defendant to the scene. *178 However, the court found that, in contrast to Dunn, there was no obvious motivation for Young to lie, Young's testimony had few if any contradictions, his testimony was not contradicted by that of any other witnesses, and that other evidence tended to support Young's story even though the other evidence did not directly connect the defendant to the crime.
In Willis, the court found that the evidence that the defendant possessed marijuana found in plain view in a motel room was sufficient to support his conviction. In addition to the testimony of a co-defendant who entered a guilty plea, police officers testified to their observation of weapon under the covers of the bed in which the defendant was concealing himself; additionally the only personal effects found in the motel room belonged to the defendant.
In the instant case, the testimony of Clarence Emilien was not wholly uncorroborated. Mervyn Duckworth testified that he observed three men in a car outside the victim's home. Two of the men exited while one remained in the back seat. This coincides with Emilien's testimony that he was sitting in the back seat and did not leave the vehicle. Duckworth had previously met Ryan Smith at the victim's home at a party, and Duckworth identified Smith as one of the two men he saw entering the victim's home. He testified that Smith ran from the house after the shots were fired and that Smith had no gun in his hands.
The appellant suggests that Emilien should not have been believed because he lied about the gun, which might have been the murder weapon. However, Emilien's complicity in the events leading up to the victim's murder was not disputed. He admitted that he and the defendant intended to purchase drugs. The fact that Emilien may have had a greater level of participation than he was willing to admit to did not require that the jury discount all of his testimony. Notably, Emilien and Duckworth placed a total of three men at the murder scene: one who stayed in the vehicle and two who went into the house with the victim, while the appellant suggests that only Ryan Smith and Clarence Emilien were involved in the murder and drug deal. Furthermore, the fact that Emilien was present on the murder scene was corroborated by the fact that he knew Duckworth was there and drove off when the shots were fired. Both men testified to Smith's presence on the scene, and both denied that he was the shooter. Additionally, the police found evidence of an aborted drug transaction, in the form of a scale and a bag containing a wad of paper folded to mimic currency. Thus, as in Jackson, the elements of the accomplice's story were corroborated. Moreover, as noted in Jackson when distinguishing Dunn, there is nothing in the trial transcript which would indicate that the accomplice, either Emilien or Smith, had a grudge against the defendant, nor any testimony from any witnesses to explain why either and both would have randomly chosen to inculpate the defendant in this murder.
While accomplice testimony should be carefully scrutinized, in this case it does not appear that Emilien's testimony was so contradicted by other evidence or uncorroborated that a rational jury could not have relied upon it to find that the defendant was guilty.
Therefore, I would affirm the manslaughter conviction of the defendant.
NOTES
[1] Officer Dixon could not remember if the front door was open or closed, but testified that he did not use anything to avoid leaving his fingerprints on the doorknob.
[2] When Detective Crowden arrived, the victim had already been pronounced dead, presumably by the coroner's office.
[3] Whereas Officer Dixon testified that he saw the casings through the glass in the door prior to entering the house; Detective Crowden testified that the casings were found next to the victim's body.
[4] According to the crime scene report, a Crown Royal bag containing several napkins wrapped in a blue washcloth, a bloodstained Nike shoebox, and a Reebok shoebox containing a Sunbeam scale were retrieved from the kitchen table.
[5] According to the crime scene report the interior side of the front door was dusted with negative results.
[6] The initial police report stated that Mr. Duckworth saw Ryan Smith running out of the house with a gun in his hand. That statement was subsequently changed to state that Duckworth saw Smith running out of the house with no gun in his hand.
[7] In his trial testimony, Detective Crowden failed to relate that a warrant had been obtained for Emilien's arrest, indicating only that Emilien was arrested after naming the defendant as the perpetrator of the crime.
[8] According to Detective Crowden's police report narrative. Detective Crowden went to Emilien's residence on August 19, 2002, and observed a white vehicle fitting the description of the vehicle used in the offense. After watching the vehicle for an hour, Detective Crowden and other members of the Third District Task Force went to see if Emilien was home and spoke to a young black male who identified himself as Clarence Emilien's brother and stated that his brother was not home. Detective Crowden did not mention the white vehicle at trial.
[9] At trial, Emilien stated that he also gave a taped statement at 12:45 a.m. in which he lied; this statement was never produced. In addition, the NOPD "gist sheet" indicates that Emilien went to the victim's residence to conduct a drug deal and during the transaction his associate fatally shot the victim and fled the residence with the narcotics. The gist sheet also indicates that other witnesses identified Emilien as being on the scene and observed him entering a waiting vehicle and fleeing with the shooter.
[10] The record contains a NOPD evidence and property receipt for two items "confiscated" from the coroner's office on August 18, 2002: barcode # 231317, described as 2 spent bullets, and barcode # 231318, described as "one inked fingerprint card, DO-2618-02, LATPRT." Presumably, the fingerprint was taken from the victim but there is nothing in the record to indicate that any attempt was made to discover whether there were fingerprints on the bullet casings, the scale, or the shoeboxes, which could be compared with the fingerprints of the defendant, the victim, or any of the witnesses.
[11] In his grand jury testimony, however, Detective Crowden related that Duckworth gave him the name of Smith, one of the persons waiting for Williams and "[a]lso we received a 911 phone call from that person who was Ryan Smith."
[12] There is some indication that Hughes had purchased the white Lumina from Williams.
[13] According to the police report, Duckworth stated that he observed Smith and two black males sitting in a burgundy vehicle parked in front of Williams' residence and also observed another vehicle, a white Lumina, parked with someone sitting inside the vehicle, that Smith and one of the males entered Williams' house with Williams, and that after hearing the gunshots he saw Smith run from the house waving his hands and the other black male subject run from the residence and enter the white Chevrolet Lumina waiting outside Williams' house. Although the police reports also indicate that Detective Crowden and other officers watched a white Lumina parked outside Emilien's residence the following day for a period of time before inquiring as to whether Emilien was at home, neither Duckworth or Crowden mentioned the white Lumina in their direct testimony and on cross-examination, Duckworth denied saying that he saw a white Lumina sitting outside in front of the house with a person in it.
[14] There is no description of Hughes in the trial transcript but his "suspect rap sheet" indicates that he is 5'6" and weighs 155 pounds with a medium body build.
[15] The mere fact that the issue is a credibility determination does not limit the obligation of the reviewing court. The Louisiana Supreme Court has established the methodology of applying the Jackson standard to a criminal appeal:

After reviewing Jackson and the foregoing authorities, we conclude that a reviewing court may not disregard its duty under due process of law as interpreted by Jackson v. Virginia simply because the record contains testimony which tends to support each fact necessary to constitute the crime. If the court finds that no rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally. The actual trier of fact's rational credibility calls, evidence weighing and inference drawing are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution, and by the admonition that the sufficiency inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt.
State v. Mussall, 523 So.2d at 1311.
[16] Smith was unavailable for trial but Emilien described him as being approximately 5'10". Hughes was sitting in the courtroom.
[17] Because defendant's conviction is reversed, we need not reach his second assignment of error. We do note, however, that because the victim was not under age ten that the trial court erred in stating that the sentence must be served without benefits. See La. Rev. Stat. 14:31(B).