943 So.2d 1047 (2006)
STATE of Louisiana
v.
Tron HUGHES.
No. 2005-K-0992.
Supreme Court of Louisiana.
November 29, 2006.
*1049 Charles C. Foti, Jr., Attorney General, Eddie J. Jordan, Jr., District Attorney, Zata W. Ard, Assistant District Attorney, for Applicant.
Sherry Watters, New Orleans, for Respondent.
KIMBALL, Justice.
Defendant was charged with the first degree murder of Shannon Williams. After a trial by jury, he was convicted of manslaughter and sentenced. The court of appeal reversed defendant's conviction and sentence, finding the evidence insufficient to prove defendant's identity as the perpetrator beyond a reasonable doubt. After consideration of the record, we disagree and find the evidence presented was sufficient to persuade a rational trier of fact beyond a reasonable doubt that defendant was the perpetrator. The testimony of defendant's accomplices, though at times inconsistent and self-serving, was sufficiently corroborated to support defendant's conviction for manslaughter. Consequently, we reverse the judgment of the court of appeal, reinstate defendant's conviction and sentence, and remand the case to the court of appeal for it to consider defendant's remaining assignment of error.

Facts and Procedural History
On August 17, 2002, at approximately 7:30 p.m., Shannon Williams was shot twice in the head in the kitchen of his residence on Emory Road. The New Orleans Police Department dispatched officers to the scene in response to reports of shots fired on Emory Road. Officer Yancy Dixon and Officer Harry Brown were the first to arrive on the scene. Officer Dixon looked through the glass in the front door and saw two spent bullet casings, then entered the residence. Once inside, the officers found Williams, unresponsive and lying on his side in the kitchen, bleeding from the head. Two shoe boxes, one containing a digital scale, and a Crown Royal bag, were on the kitchen table.
Detective Bernard Crowden led the investigation into Williams's homicide. The detective first interviewed Mervyn Duckworth, Williams's employer. In a taped statement, Duckworth stated that he dropped Williams off at his house around 7:30 in the evening. When they arrived, Ryan Smith and two other men were waiting for Williams in a burgundy-colored car and one person was waiting in a white car. Smith, who was the driver, and the man seated in the front passenger seat of Smith's car went into the house with Williams. According to Duckworth, Smith's passenger was carrying a shoe box. Duckworth then heard two gunshots and saw Smith immediately run out of the house. After viewing a photographic lineup, Duckworth identified Smith as the man he saw running out of the house.
Detective Crowden also interviewed Smith. Smith told the detective that his nephew, Clarence Emilien, and Emilien's friend wanted to buy a car from Williams. Smith drove Emilien to Williams's house to buy the car. Emilien's friend followed in another car. Williams was not at home when they arrived, and Emilien's friend got in the front passenger seat of Smith's car with a shoe box. When Williams arrived, Smith followed Williams and Emilien's friend into the house. Once inside, Emilien's friend removed a gun from the shoe box and shot Williams. Both he and Emilien's friend ran out of the house. Emilien's friend jumped into a white car containing Emilien and another man. The white car drove away quickly and Smith ran back into Williams's house to retrieve his car keys before driving home and calling the police. Smith described Emilien's friend as a little shorter than himself, with *1050 short, uncombed hair that looked "nappy like you just been rubbing your hand in your hair or something like that."
Based on Smith's account, Detective Crowden attempted to contact Emilien. Subsequently, Emilien arrived at the police station with his mother. In a taped statement, he named defendant, a childhood acquaintance, as the third person on the scene. He also identified defendant from a photographic lineup. Emilien stated they went to Williams's house to buy drugs. Emilien stated Smith drove to Williams's house, defendant rode in the front passenger seat, and he rode in the back seat. Emilien stated he ran when he heard the shots. Emilien was later arrested as a principal to first degree murder.
Shortly after Emilien's arrest, Smith was arrested as an accessory after the fact to the murder. Smith later identified defendant from a photographic lineup as the person who shot Williams.
Several days later, on August 27, 2002, Detective Crowden arrested defendant at the Greyhound Amtrak Station after defendant approached him while he was working a paid detail at the security desk in full uniform and asked where he could catch a taxi. Upon searching defendant, Detective Crowden recovered a Houston-New Orleans bus ticket purchased by Donny Minor, dated August 26, 2002, and $585.00 in cash. Defendant told the detective that he was returning home from Texas because his mother called to tell him that he was on the news. He further stated that his cousin purchased the bus ticket for him, and that he planned to turn himself in to the police after talking to his lawyer.
Defendant was indicted by a grand jury for one count of first degree murder, a violation of La. R.S. 14:30. Both Emilien and Smith entered into plea agreements with the State in exchange for their testimony against defendant.[1] A jury subsequently found defendant guilty of the responsive verdict of manslaughter. The trial court sentenced him to 20 years of imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.
Defendant appealed his conviction and sentence to the court of appeal, arguing the evidence was insufficient to support a conviction for manslaughter, and the sentence was unconstitutionally excessive. Finding that the evidence presented at trial was insufficient to sustain the jury's verdict, the appellate court reversed defendant's conviction and sentence, and ordered defendant discharged from custody. State v. Hughes, 04-1797 (La.App. 4 Cir. 3/16/05), 900 So.2d 168. Specifically, the court of appeal found that no rational trier of fact, after viewing all the evidence in the light most favorable to the prosecution, could find that the identity of the perpetrator was proven beyond a reasonable doubt. The court of appeal determined that the only evidence connecting defendant to the crime came from the testimony of Emilien and Smith. It pointed out, however, the self-serving nature of their testimony and that the initial statements of Emilien and Smith were different in some respects from their testimony. It also noted that Emilien acknowledged he owned the same type of gun used in the murder and lied about its whereabouts at the time of the murder. The court of appeal also relied on the fact that no physical evidence connected defendant to the crime scene. Finally, it pointed out that the physical description given by Duckworth, the only *1051 eyewitness unrelated to Emilien and Smith, was inaccurate.
One judge dissented from the court of appeal's opinion. The dissenting judge stated that Emilien's testimony was not wholly uncorroborated, and that his complicity in the events leading up to the murder was not disputed. The dissenting judge concluded that Emilien's testimony was not so contradicted by other evidence or uncorroborated that a rational juror could not have relied upon it to find defendant guilty.
Upon the State's application, we granted certiorari to review the correctness of the court of appeal's decision. State v. Hughes, 05-0992 (La.1/9/06), 918 So.2d 1019. In its brief, the State contends the court of appeal erred in finding insufficient evidence to convict defendant of manslaughter when the evidence included virtually uncontested observations of defendant by two witnesses.

Discussion
"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). Furthermore, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Weary, 03-3067 (La.4/24/06), 931 So.2d 297; State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. Weary, 03-3067 at p. 18, 931 So.2d at 311; Neal, 00-0674 at p. 11, 796 So.2d at 658; State v. Mussall, 523 So.2d 1305, 1311 (La.1988). It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. State v. Bright, 98-0398, p. 22 (La.4/11/00), 776 So.2d 1134, 1147.
Moreover, in Louisiana, an accomplice is qualified to testify against a co-perpetrator even if the State offers him inducements to testify. Neal, 00-0674 at p. 11, 796 So.2d at 658. The inducements would merely affect the witness's credibility. Id. at p. 12, 796 So.2d at 658. Additionally, a conviction may be sustained on the uncorroborated testimony of a purported accomplice, although the jury should be instructed to treat the testimony with great caution. State v. Tate, 01-1658, pp. 4-5 (La.5/20/03), 851 So.2d 921, 928. When the accomplice's testimony is materially corroborated by other evidence, such language is not required. Id.; State v. Castleberry, 98-1388, p. 13 (La.4/13/99), 758 So.2d 749, 761. An accomplice's testimony is materially corroborated "if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation." Castleberry, 98-1388 at p. 13, 758 So.2d at 761 (quoting State v. Schaffner, 398 So.2d 1032, 1035 (La.1981)).
In this case, the sole issue is defendant's identity as the perpetrator. Thus, we must determine whether the State negated any reasonable probability of misidentification. At trial, the State used the testimony of three witnesses to prove defendant's identity as the shooter: (1) Ryan Smith, who was deceased at the time of trial, but who positively identified defendant as the shooter; (2) Clarence Emilien, Smith's *1052 nephew, who confirmed defendant entered Williams's house with Williams and Smith before the gunshots rang out; and (3) Mervyn Duckworth, Williams's employer, who identified Smith as one of the two men he saw entering Williams's home and who later saw Smith running from the house without a weapon in his hands immediately after the shots were fired. The defense challenged the credibility of these witnesses, making particular issue of Emilien's bargained-for testimony,[2] and relied on defendant's cousin for an alibi defense.
Because Ryan Smith was deceased at the time of trial, his previous sworn testimony given at a motion hearing was read to the jury. Smith identified defendant from a photographic lineup as the shooter. He also described defendant as having uncombed, nappy hair and wearing a white t-shirt and jeans. Detective Crowden also testified that Smith positively and immediately identified defendant as the person who went into Williams's residence with him and shot Williams in the head.
Mervyn Duckworth, who was Williams's employer, testified at trial that he had previously met Smith at Williams's house. He stated that on the day of the murder, he and Williams had run errands, that Williams had used his truck for various errands, and that Williams had asked for a ride home. When they got to Williams's home, Smith's car was already parked in the driveway, so Duckworth parked behind Smith's car. Williams got out, and Smith and his front seat passenger exited the car. A third person remained in the backseat of the car. Duckworth described the front seat passenger as thinner and smaller than Smith.[3] Duckworth testified that shortly after the men walked toward the house, he heard a gunshot. At the same time he heard the second shot, he saw Smith running from the house waving his empty hands above his head. Duckworth did not see any weapon in Smith's hands. He testified that when the first shot was fired, the passenger who had remained in the car seemed surprised because he quickly turned his head. After hearing the shots and observing Smith running out of the house, Duckworth drove away. Duckworth subsequently identified Smith from a photographic lineup. He described the front seat passenger that accompanied Smith into Williams's house as wearing a white t-shirt and perhaps black pants.
Clarence Emilien testified at trial that he had entered into a Memo of Understanding with the State in which he agreed to plead guilty to accessory to first degree murder and would be sentenced from zero to five years in exchange for his truthful testimony in defendant's case. Emilien admitted to defense counsel that he had already pled guilty to accessory to first degree murder and to possession of cocaine, and had already been sentenced to probation.
Emilien testified that he and defendant had been friends since they were in kindergarten. On the day of the shooting, he and defendant were at a back-to-school party together. Prior to the shooting, Emilien and defendant had gone to Williams's house around 5:00 p.m. for defendant to buy a kilo of cocaine from Williams for $20,000.00. Emilien testified that Williams did not want to do business *1053 with defendant at that time because defendant had a gun, a .357 revolver. When Williams refused to make the sale, Emilien and defendant left. Later, Williams called and told them he would make the sale if defendant was unarmed and Ryan Smith, Emilien's uncle, accompanied them back to his house. Emilien testified that Smith agreed, and they left Smith's workplace in Smith's car, with Emilien riding in the back seat and defendant riding in the front passenger seat. Williams was not home when they arrived at his house, but he got there as a passenger in Duckworth's vehicle about five minutes later. Williams exited Duckworth's vehicle, and defendant and Smith got out of the car. Defendant was carrying a Crown Royal bag and a Nike shoe box. Emilien testified he remained in the car looking for a scale and Duckworth remained in his vehicle. When he heard gunfire, Emilien looked up and saw Smith running with nothing in his hands. Duckworth left and Emilien got out of the car and ran to his aunt's house. Later, Emilien identified defendant in a photographic lineup and made an in-court identification of defendant.
Emilien testified that he owned a Taurus 40-caliber weapon, but that he was not in possession of the gun at the time of trial. He stated that the gun was taken by police officers when he was pulled over for a traffic violation in a separate incident. He stated he did not know where the gun was located. Both Detective Bickham and Officer Prepetit testified that Emilien's 40-caliber gun had not been seized in conjunction with the traffic stop, and Sergeant Meisch further testified that property room records did not show a seizure of Emilien's gun.
For the defense, Torrey Lewis, defendant's cousin, testified that on August 17, 2002, defendant visited his snowball stand at St. Bernard and Robertson several times throughout the day and then returned between 7:00 and 8:00 p.m. to help him clean up after closing that evening.
After hearing this, and other, testimony, the jury rejected defendant's alibi defense and returned the responsive verdict of manslaughter against defendant. After considering the record in this case, we find the State negated any reasonable probability of misidentification such that a reasonable jury could have found defendant guilty of manslaughter. We do not find the jury's credibility calls regarding defendant's identification irrational.
The testimony of Duckworth, Smith, and Emilien was not clearly unworthy of belief. Duckworth, the only neutral eyewitness, testified that he observed three men in a car outside Williams's house. He observed two men exit while one remained in the back seat. This account coincides with Emilien's testimony that he remained in the back seat of the vehicle. Consistent with Emilien's testimony, Duckworth indicated that the man with Smith carried a shoe box into the house. Duckworth further testified that he had previously met Smith at Williams's home and identified Smith as one of the two men he saw entering the victim's home. He later saw Smith run from the house without a weapon in his hands. This, too, is consistent with Emilien's testimony. In fact, Duckworth testified that Smith was already outside of the house when the second gunshot was fired. Furthermore, it appears the court of appeal's reliance on Duckworth's testimony concerning the physical description of the man who went inside the house with Smith is misplaced. Although Duckworth testified that the man with Smith had a similar build, Duckworth emphasized that the other man was smaller. In addition to Duckworth's testimony ruling out Smith as the shooter, his physical description of the man who remained in the back *1054 seat matched Emilien's build, thereby suggesting that defendant was the man who went into the house with Smith and the victim.
As for Emilien's credibility, while he apparently lied about the confiscation of his gun, he readily implicated himself in the plan to purchase drugs from Williams. Moreover, the jury was well aware that the state bargained for Emilien's testimony. Thus, despite the suspicion raised by accomplice testimony, "in this case it does not appear that Emilien's testimony was so contradicted by other evidence or uncorroborated that a rational jury could not have relied upon it to find that defendant was guilty." Hughes, 04-1797 at p. 4, 900 So.2d at 178 (McKay, J., dissenting). Given this corroborative testimony from Duckworth, Emilien's testimony placing defendant at the scene, and Smith's positive identification of defendant as the shooter, we find the court of appeal erred in finding the state's evidence of defendant's identity as the perpetrator insufficient.
Defendant complains of the trial court's failure to provide the jury with a cautionary instruction on accomplice testimony. As an initial matter, the record reveals that defendant never requested such an instruction be given. Additionally, the testimonies provided by Duckworth, Emilien, and Smith each corroborated the version provided by the others. Furthermore, the trial judge instructed the jury "to scrutinize carefully the testimony and the circumstances under which the witness has testified," including "any reason he may have for testifying in favor of or against the State, or the defendant, and the extent to which the testimony is supported or contradicted by other evidence." In addition, defendant's trial counsel summarized the instruction on witness credibility during his closing argument. Given the independent corroborating testimony in the case, the trial court's instruction provided sufficient guidance to the jury for its evaluation of the accomplices' testimony.
The jury had full disclosure of all of the circumstances militating against a reliable identification and still found the witnesses' testimony sufficient to exclude any reasonable probability of misidentification. The jury was fully informed of inconsistencies between the witness' trial testimony and their previous statements. Defense counsel fully discussed Emilien's bargain with the State. Here, a rational trier-of-fact could have believed the State's witnesses and rejected the alibi testimony from defendant's cousin as self-serving. For all that appears, the jury accepted the State's suggestion in its closing argument that "the drug deal got so heated, they got so mad at each other for playing each other that maybe it's a manslaughter." That jurors returned a verdict on a lesser included responsive offense as an alternative to conviction on the charged offense or an outright acquittal is no grounds for viewing the result as irrational or as mandating reversal based on insufficiency of evidence.

Decree
For all the above reasons, we find the court of appeal erred in determining that no rational trier of fact could have found the identity of the perpetrator proven beyond a reasonable doubt. Consequently, we reverse the judgment of the court of appeal and reinstate defendant's conviction and sentence. The case is remanded to the court of appeal for it to consider defendant's remaining assignment of error.
REVERSED. CONVICTION AND SENTENCE REINSTATED. REMANDED TO COURT OF APPEAL *1055 FOR CONSIDERATION OF REMAINING ASSIGNMENT OF ERROR.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, J., dissenting.
I respectfully dissent from the majority's conclusion that the evidence supports defendant's conviction for manslaughter.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984).
In the case sub judice, the victim, Shannon Williams, was shot twice in the head in an aborted drug transaction on August 17, 2002. Mervyn Duckworth drove Williams to his residence that evening. He later testified that he saw Williams enter his residence with two or three men who were waiting for Williams. Duckworth was able to identify only Ryan Smith. The first calls to the 911 operator were from Ryan Smith, who admitted when interviewed that he was at the crime scene with his nephew, Clarence Emilien, and his nephew's friend to buy a car from the victim.
The testimony tying Tron Hughes to the crime, came from Clarence Emilien. (According to Emilien, Duckworth was the victim's cocaine supplier.) Emilien was initially arrested and charged with first degree murder and with possession of cocaine. Both Smith and Emilien entered into plea agreements with the State in exchange for their testimony against the defendant. In exchange for a guilty plea to accessory after the fact and simple possession of cocaine, Emilien was sentenced to concurrent terms of three years, suspended, with three years active probation. Smith died before the case came to trial, and his pre-trial testimony was read to the jury.
There was no physical evidence, at all, to tie the defendant to the crime scene. The bullet casings and other physical evidence at the crime scene had no fingerprints or DNA implicating Hughes. Duckworth could not identify Hughes as the third man at the crime scene with Smith and Emilien. So, what we are left with, is the uncorroborated and self-serving testimony of the uncle and nephew, Smith and Emilien. When we view this evidence in the light most favorable to the prosecution, no rational fact finder could find that every essential element of the crime was proven beyond a reasonable doubt. I would affirm the decision of the court of appeal.
NOTES
[1] Smith died before the trial. His pretrial motion hearing testimony was read to the jury and the tape of his 911 calls was played for the jury.
[2] Emilien pled guilty to accessory to first degree murder, as well as to a charge for possession of cocaine arising out of a separate incident, and received a probated sentence on both charges.
[3] Specifically, on cross-examination, Duckworth explained that the front seat passenger was "almost Ryan Smith's size, like, an averaged type person. But a little younger or smaller, a little skinnier, or smaller."