STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-79

STATE OF LOUISIANA

VERSUS

BRENT M. JOHNSON

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 169222
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**********

D. KENT SAVOIE
JUDGE

**********

Court composed of D. Kent Savoie, Jonathan W. Perry, and Gary J. Ortego, Judges.

CONVICTION AND SENTENCE AFFIRMED.

**Donald Dale Landry**
**District Attorney**
**Fifteenth Judicial District Court**
**Post Office Box 3306**
**Lafayette, Louisiana 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Kenneth P. Hebert**
**Broussard & David**
**Post Office Box 3524**
**Lafayette, Louisiana 70502-3524**
**(337) 233-2323**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**Post Office Box 1481**
**Monroe, Louisiana 71210**
**(318) 855-6038**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Brent M. Johnson**

**SAVOIE, Judge.**

On December 5, 2018, Defendant, Brent M. Johnson, was charged by grand jury indictment with the September 6, 2018 second degree murder of Mr. Jason Carbins, in violation of La.R.S. 14:30.1. Trial began on December 5, 2022. On December 6, 2022, Defendant was found guilty as charged, and on December 8, 2022, Defendant received the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Defendant now appeals his conviction and sentence, raising a single assignment of error:

> The State failed to prove beyond a reasonable doubt Brent Johnson was responsible for the death of Jason Carbins. The witnesses who identified Mr. Johnson as the shooter provided inconsistent testimony. No gun was recovered; and, there was no DNA or fingerprint evidence linking Mr. Johnson to Mr. Carbins' home where the shooting occurred.

For the reasons that follow, Defendant's conviction and sentence are affirmed.

## FACTS

The State's first witness was Detective Peter Ford of the Lafayette Police Department. Detective Ford testified that on September 6, 2018, he was working patrol when he was dispatched to a homicide on Lafayette Street. In addition to a complainant who called law enforcement after hearing gunshots, Detective Ford spoke with "the Bias brothers," witnesses who heard the gunshots when they were working on their bike. According to Detective Ford, the victim was lying face down a little to the left of the door into the home; he estimated the shell casings were roughly ten yards away from the door in the driveway.

On cross-examination, Detective Ford acknowledged they were unable to pinpoint a suspect the day of the shooting. He testified the only description he was given of the shooter was "unknown black male suspect, 5'10", medium build, with a low haircut."

The State then called Mr. Stephon Bias. Stephon testified he grew up with the victim Jason Carbins' mother and had known Mr. Carbins his entire life. According to Stephon, he and his brother were speaking with Mr. Carbins near his door when Defendant walked past them, opened the screen door into Mr. Carbins' home and the two began to argue. Stephon testified Defendant and Mr. Carbins began to argue before Defendant ran from the house and fired multiple shots toward Mr. Carbins and the Bias brothers. Stephon testified he and his brother called 9-1-1 after Mr. Carbins told them he was hit then fell while trying to get to his chair.

Stephon admitted he did not know Defendant's name at the time of the shooting. He testified he recognized Defendant from the neighborhood but did not know him personally. Stephon testified he also recognized that Defendant often drove around the neighborhood in a gray Chevrolet Impala; however, he acknowledged initially thinking it was a Chevrolet Lumina, noting "they all look alike." According to Stephon, he was shown multiple photographic lineups which did not contain Defendant before he identified Defendant as the shooter.

According to Stephon, law enforcement never questioned him about what the shooter was wearing but he knew the shooter was wearing black clothing. Stephon testified he did not speak to Defendant when he approached Mr. Carbins' door. He testified he saw Defendant for about twenty seconds as he approached and entered Mr. Carbins' home. He stated he had never had a personal interaction

2

with Defendant prior to the morning of the shooting. He clarified he had seen Defendant "two or three" times before but had not interacted with him personally.

The State's next witness was Mr. Clarence Bias. Clarence testified he had known the victim since Mr. Carbins was a "little child." He stated that, on September 6, 2018, Defendant walked right into Mr. Carbins' home. Clarence testified Defendant stepped back from the door and started shooting at Mr. Carbins. He thought Defendant shot five or six times and stated the gun was "[a] nickel-plated nine." Like his brother, Clarence testified they called law enforcement and also that he did not know Defendant's name at the time of the shooting. He also testified he recognized Defendant from the neighborhood, noting he picked Defendant out of a photo lineup. Clarence testified Defendant drives a grey sedan, although he initially identified it as a Chevy Lumina.

Both Bias brothers acknowledged having drug-related criminal convictions, although defense counsel attacked Clarence's claim that he only had marijuana convictions since he had a distribution of cocaine conviction in September of 1992. Clarence acknowledged having previously told law enforcement the shooter was wearing khaki pants and a white shirt but contended that was the result of being shaken over the shooting; at trial, he was insistent Defendant was the shooter and that he had been wearing all black. Clarence stated that, on the day of the shooting, he began drinking right around the time the shooting happened and that he was drinking a beer when Defendant walked up to the victim's door. He stated he only had one beer that morning. He then again claimed the car Defendant drove was a gray Lumina, testifying he saw it all the time. Clarence testified Defendant backed out of Mr. Carbins' doorway almost all the way to the apartments in front

of Mr. Carbins' home. He again stated he heard about five shots fired while he was running for cover.

The State then called Detective Julia Poirier of the Lafayette Police Department's Crime Scene Division in order to introduce photographs taken at the scene. She noted they only found two spent casings at the scene, both nine-millimeter cartridges. She testified one projectile was removed from the exterior wall of the victim's home and the other was removed from the victim during the autopsy. Detective Poirier testified that although they only recovered two spent shells and two projectiles, it is possible more than two shots may have been fired.

The State's next witness was Lieutenant Don Thibeaux, a twenty-four-year veteran of the Lafayette Police Department. Lieutenant Thibeaux testified that at the time of the shooting, he was the sergeant in charge of the Special Investigations Unit and led the effort to canvass the area for potential witnesses or suspects. Lieutenant Thibeaux testified that a nearby residence, 312 Madison Street, was the home of one of Defendant's relatives.

The State then called Mr. Albert J. Prejean, Jr., who testified he lived at 305 Madison Street and had surveillance cameras on each corner of his home. The State then introduced four separate video clips taken from Mr. Prejean's cameras on the day of the shooting between 9:54 a.m. and 10:50 a.m. The videos show a gray or silver sedan parked on the side of 312 Madison Street just before 10:00 a.m. Two individuals then come around to the front of the home, one of them in all black clothing. The individual in black then walks down the street around 10:04 a.m. At 10:32, the individual in all black returns, jogging toward the front door of the house at 312 Madison Street. He and the individual he arrived with initially then jump into the gray sedan and leave the area at 10:33 a.m.

4

The State then called Detective James Gayle, a thirteen-year veteran of the Lafayette Police Department. Detective Gayle testified he was the lead detective on the case. According to Detective Gayle, Clarence was transported to the police department to give a witness statement while Stephon was interviewed at the scene by his own choice. Detective Gayle noted he spoke with Stephon but not Clarence. According to Detective Gayle, their investigation led them to two individuals who had had social media arguments with the victim, so the Bias brothers were shown lineups containing those two individuals but neither brother identified anyone in those lineups. Additionally, they had received information that a suspect in a black shirt and black shorts was seen fleeing the scene of the shooting. Subsequently, other law enforcement officers were advised the individual seen running from the scene of the shooting had ran down Sherman and turned onto Madison Street.

Detective Gayle testified the video surveillance from Mr. Prejean showed law enforcement the individual in all black returning to 312 Madison Street before leaving in a silver Impala. According to Detective Gayle, it was subsequently determined the Impala belonged to Ms. Racquel Celestine, Defendant's girlfriend at the time. He testified the first report of the shooting came in right around 10:30 a.m. According to Detective Gayle, they determined Defendant's brother was with him at 312 Madison Street and in the car. He also testified the residents of 312 Madison Street refused to give their names to law enforcement. Detective Gayle testified the residents of 312 Madison Street initially told law enforcement they did not know who had come to their residence, then admitted it was their nephew, then claimed they did not know the nephew's name.

After developing Defendant as a suspect, a picture of him was placed in a six-person lineup and shown to the Bias brothers, who both confidently identified

5

him as the shooter. Detective Gayle testified they were unable to locate Defendant in Louisiana, noting he was eventually arrested in Washington, about two hours south of the U.S. – Canada border. Detective Gayle testified Defendant was subsequently extradited to Louisiana. According to Detective Gayle, Defendant was brought to the Lafayette Parish Correctional Center on October 10, 2018, at which time he was arrested for the murder of Mr. Carbins; however, Defendant invoked his right to remain silent and stated he did not wish to speak with detectives or give a statement.

Detective Gayle confirmed on cross-examination there was no video or DNA evidence placing Defendant at the scene of the shooting; his identification was based solely on the Bias brothers, who were both near the victim at the time of the shooting. He also acknowledged that Clarence initially told law enforcement the shooter was wearing a white shirt and khaki pants.

The State's final witness was Doctor Christopher Tape, who was accepted as an expert in the field of forensic pathology. Doctor Tape testified the cause of death for Mr. Carbins was a gunshot wound to the body of the abdomen. He further noted the bullet went through the victim's small intestine before hitting the iliac vein in his hip, causing a large amount of internal bleeding. Following Dr. Tape's testimony, both the State and Defendant rested.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent present.

**ASSIGNMENT OF ERROR**

In his sole assignment of error, Defendant challenges the sufficiency of the evidence against him; specifically, he contends the State failed to prove his identity as the shooter because the only evidence connecting him to the shooting is the eyewitness testimony of the Bias brothers, which he contends was too inconsistent to be believed. Because Defendant only challenges the State's proof of his identity as the individual who shot Mr. Carbins, we will only address that element. The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Louisiana law requires the State "to negate any reasonable probability of misidentification" when the key issue in a case is the defendant's identity. *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051 (citing *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002)). However, "[p]ositive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the

respective credibilities of the witnesses, and this court will generally not second-guess those determinations." *Id.* (citations omitted). In short, Defendant's argument is a pure credibility determination.

Two eyewitnesses to the shooting both positively identified Defendant, whom they did not know well enough to know his name at the time, from a photographic lineup. This was after the two witnesses were shown a pair of lineups which featured men who had had online altercations with the victim, and both told law enforcement the shooter was not in the lineups. While Defendant contends neither brother told police they recognized the shooter from the neighborhood at the time of the shooting, neither the State nor defense counsel actually questioned whether they had given that information to law enforcement. As such, it is impossible to determine whether the brothers told law enforcement they recognized the shooter but did not know him. Furthermore, the discovery that Defendant's relatives lived two streets away would seem to support the idea the Bias brothers may have seen him around the neighborhood occasionally.

Additionally, Defendant contends the brothers' confusion over whether the car was a Chevy Impala or a Chevy Lumina shows they were simply trying to match the car to Defendant's girlfriend's vehicle. Both vehicles were mid-sized sedans made by Chevrolet; furthermore, the identification of the car has no impact on the fact both witnesses, after being shown three different six-person lineups, identified Defendant as the shooter. Finally, Defendant attacks the fact Stephon did not provide law enforcement with a description of the shooter's clothing and Clarence provided a description that did not match the clothing Defendant was wearing at the time of the shooting. Clarence testified he was shaken at the time, having just watched a close friend get killed in front of him, and may have said the

8

wrong thing. Nonetheless, he maintained that he correctly selected the shooter out of the lineups.

All these inconsistencies were made clear to the jury in the instant case; nonetheless, Defendant was unanimously found guilty as charged. Accordingly, the jury must have determined it found the testimony of the brothers to be credible, at least with respect to the identification of Defendant as the shooter. In light of the above law and testimony provided at trial, when viewing the evidence in a light most favorable to the prosecution, a rational finder of fact could have found the State proved Defendant was the man who shot Mr. Carbins. Accordingly, Defendant's only assignment of error lacks merit and his conviction and sentence for second degree murder are affirmed.

## DECREE

Defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**