# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 18-832


**STATE OF LOUISIANA**

**VERSUS**

**DEVONTE LEN ROBERTS**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 26727-13
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**ELIZABETH A. PICKETT**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and Van H. Kyzar, Judges.


**CONVICTIONS AFFIRMED;**
**SENTENCES VACATED AND REMANDED FOR RESENTENCING.**

**John F. DeRosier**
**District Attorney**
**Fourteenth Judicial District**
**Shelley A. Deville**
**Ross Murray**
**Assistant District Attorneys**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Devonte Len Roberts**

**PICKETT, Judge.**

<u>FACTS</u>

On December 12, 2013, the defendant, Devonte Len Roberts, was charged by bill of information with armed robbery, in violation of La.R.S. 14:64; armed robbery with a firearm, in violation of La.R.S. 14:64.3; aggravated assault upon a peace officer with a firearm, in violation of La.R.S. 14:37.2; attempted armed robbery, in violation of La.R.S. 14:64; attempted armed robbery with a firearm, in violation of La.R.S. 14:64.3; and aggravated assault with a firearm, in violation of La.R.S. 14:37.4. All six counts arose out of a September 26, 2013 robbery of a Wing Stop restaurant.

Prior to beginning the trial on January 29, 2018, the state filed an amended bill of information charging the defendant with one count of armed robbery with a firearm, in violation of La.R.S. 14:64 and 14:64.3; one count of aggravated assault upon a peace officer with a firearm, in violation of La.R.S. 14:37.2; one count of attempted armed robbery with a firearm, in violation of La.R.S. 14:27, 14:64, and 14:64.3; and four counts of aggravated assault with a firearm, in violation of La.R.S. 14:37.4.

Following a two-day trial, the defendant was unanimously found guilty as charged on all counts except count two, where a ten-two jury found the defendant guilty of the responsive verdict of attempted aggravated assault upon a peace officer in violation of La.R.S. 14:27 and 14:37.2.

On April 18, 2018, the defendant was sentenced to serve ten years at hard labor on each count of aggravated assault with a firearm; five years at hard labor on the attempted aggravated assault on a peace officer; and thirty years at hard labor for both the armed robbery with a firearm and the attempted armed robbery

with a firearm; all of the defendant's sentences were ordered to run concurrently to each other.

The defendant now appeals his convictions and sentences, alleging a single assignment of error, namely, the state failed to sufficiently prove he was the individual who robbed the Wing Stop restaurant.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there is an error patent concerning two of the defendant's sentences. The trial court imposed indeterminate sentences for the defendant's convictions of armed robbery with the use of a firearm and attempted armed robbery with the use of a firearm.

Louisiana Revised Statutes 14:64 provides a sentence of ten to ninety-nine years without the benefit of parole, probation, or suspension of sentence. Louisiana Revised Statutes 14:64.3 requires the imposition of an additional five years at hard labor without the benefit of parole, probation, or suspension of sentence to be served consecutively to the sentence imposed under La.R.S. 14:64 (and 14:27 for attempted armed robbery).

For each conviction, the defendant was sentenced to serve thirty years at hard labor with no indication of whether that included the additional five years required by La.R.S. 14:64.3. In *State v. White*, 42,725 (La.App. 2 Cir. 10/24/07), 968 So.2d 901, the defendant was convicted of two counts of armed robbery with a firearm and sentenced to thirty-five years at hard labor without the benefit of parole, probation, or suspension of sentence on each count to run concurrently. In its error patent review, the court noted that the trial court did not specify what portion, if any, of the defendant's thirty-five year hard labor sentence without

2

benefits was imposed under La.R.S. 14:64.3. The court found that the absence of a specification that the defendant's sentences included a term under La.R.S. 14:64.3 rendered the defendant's sentence indeterminate. The court vacated the sentences and remanded the matter for resentencing for clarification of whether the defendant's sentences included any additional punishment under La.R.S. 14:64.3. *Id. See also State v. Billingsley*, 11-1425 (La.App. 3 Cir. 3/14/12), 86 So.3d 872.

Accordingly, in this matter, we vacate the sentences imposed for the convictions of the armed robbery with a use of a firearm and attempted armed robbery with use of a firearm and remand the case to the trial court for resentencing in accordance with La.R.S. 14:27, 14:64, and 14:64.3. The trial court should clearly set forth the portion of the sentence enhanced under La.R.S. 14:64.3.

## ASSIGNMENT OF ERROR[1]

The state failed to sufficiently prove that Devonte Roberts was the person who robbed the Wing Stop and ran from police.

## DISCUSSION

The state's first witness was Robert Broussard, the supervisor of information and custodian of records for Calcasieu Parish 911. Mr. Broussard described the technical manner in which 911 calls are monitored and recorded and acknowledged providing the Lake Charles Police Department with a CD containing calls related to the robbery of the Wing Stop on September 26, 2013. Those calls were introduced into evidence and played for the jury.

The state then called Jasmine Miller, the manager of the Wing Stop at the time of the robbery. Ms. Miller testified that right around midnight, just before the restaurant closed, she noticed someone slowly jogging up to the store and "[she] noticed that he had Timberland boots on, a facemask, and a gun." She told

---

[1] The defendant was given until January 3, 2019, to submit a pro se brief. A pro se brief was not submitted.

3

everyone they were getting robbed and "grabbed the phone and [she] immediately called 911 and [she] hid." Ms. Miller did not know what color the mask was and did not make eye contact with the robber; however, she described his boots as "very distinct boots," noting they were yellow-colored work boots. She knew the robber was a black guy but could not recall what he was wearing aside from the boots and mask.

Ms. Miller could not identify the defendant in court as the person who robbed the Wing Stop, but she testified she knew the person arrested that night was the person who committed the robbery because of his distinctive walk. She also noted the person arrested that night "had the Timberland boots on." She noted the robber was thin and around her height, which was five feet, nine inches.

On cross-examination, Ms. Miller testified that she sees Timberland boots often because "[a] lot of people wear them, especially [her] age." After reviewing her previously recorded statement to police, Ms. Miller acknowledged she never mentioned the boots to law enforcement on the night of the robbery, but noted she told them the robber was dark-skinned and noted the defendant was light-skinned. She also acknowledged she told law enforcement the robber was wearing a grey t-shirt, which she had not remembered during her previous testimony. Ms. Miller testified that she did not recall seeing any distinguishing features, such as tattoos, on the robber's arms.

On re-direct, Ms. Miller stated the style and color of the boots worn by the person arrested the night of the robbery were the same as the boots worn by the robber. She also reiterated that, despite the confusion regarding the defendant's skin tone, she is certain the person arrested the night of the robbery was the perpetrator because of his walk.

4

The state's next witness was Brandon McDaniel, one of the customers at the Wing Stop at the time of the robbery. Mr. McDaniel testified he and his friends were frequent patrons of the establishment and "knew the people that worked there." He testified a person came up to the restaurant from the left wearing a bandana, Ms. Miller said they were about to be robbed and disappeared, then the person walked in and robbed them at gunpoint. Mr. McDaniel testified the robber was wearing a blue bandana with a white design on it, blue jeans, yellow Timberlands, and a grey shirt. He stated the perpetrator lifted his shirt and revealed a gun once he had entered the building. Mr. McDaniel stated he described the individual as a "dark male," but commented that the lighting outside, where he saw the defendant as he came into the store, comes mainly from across the street and stated he did not keep his eyes on the person very long. He did note the individual had short hair. Mr. McDaniel testified the individual was skinny and took two cellphones from him, as well as his wallet. He described the phones as an iPhone 5S in a blue and green case and a red Galaxy S4; his wallet was a brown bi-fold. Mr. McDaniel testified that he positively identified the defendant as the person who robbed him on the night of the robbery, noting that in the same lighting "he appeared to be the same skin tone. He had the same pants on as well as the same shoes, the boots."

On cross-examination, Mr. McDaniel noted he told law enforcement on the night of the robbery the suspect was wearing a grey t-shirt, noting it was "more than likely" short-sleeved. He did not remember if he told police he saw any tattoos on the robber. Mr. McDaniel acknowledged blue jeans and Timberland-style boots were both pretty common attire. He also recalled describing the suspect as a "dark-skinned male;" however, he noted the defendant was "light to medium." After reviewing his statement to law enforcement on the night of the

5

robbery, Mr. McDaniel acknowledged he described the robber as "darker not light at all." Mr. McDaniel also testified that he did not remember, at trial or during his initial statement, whether or not the perpetrator of the robbery had any tattoos. Mr. McDaniel also acknowledged he told law enforcement the suspect was wearing a black leather belt.

On re-direct examination, Mr. McDaniel testified he was not concerned with the robber's arms, he was concerned with the gun being pointed at him. He also stated that he was "one hundred percent" certain the person law enforcement arrested and brought to the Wing Stop on the night of the robbery was the person who robbed him.

The state then called Dion Demouchet, the cook at the Wing Stop on September 26, 2013. Mr. Demouchet gave the same description of what happened as Mr. McDaniel and Ms. Miller: a man walked past the window, Ms. Miller shouted they were being robbed and ran, the man entered and pulled out a gun. Mr. Demouchet testified the suspect demanded to know "where's the girl?" According to Mr. Demouchet, the perpetrator started banging on the cash register demanding to know where the girl was. Mr. Demouchet stated he could not tell the individual how to get into the register and he never saw the person open the register. He described the suspect as "lean and tall," between 5'9" and 6' tall, a black male with a purple mask. Mr. Demouchet remembered the robber was wearing Timberland boots and dirty or dingy jeans but did not recall any other details about his clothing.

Mr. Demouchet described the individual who robbed them as dark skinned, stating he was around Mr. Demouchet's skin tone. On cross-examination, he described the defendant as "bright." Mr. Demouchet testified that an African-

American like himself would be lighter if they were deprived of sunlight for the better part of five years.

The state then called Ryan Nugent, another of the patrons at the Wing Stop on September 26, 2013. Mr. Nugent recounted essentially the same story. He said the manager alerted everyone they were about to be robbed, a man came in with a gun and demanded everyone get down and tried to break into the cash register while yelling about the manager's being missing. Mr. Nugent testified he could see the perpetrator's black boxers, noted he was wearing light blue jeans and a grey shirt, and recalled yellow "Timberland shoe kind of leather boot." Mr. Nugent stated he had his head down the entire time, which was why he was so confident about the shoes. Mr. Nugent commented there were shots fired as the suspect left the restaurant.

Mr. Nugent testified that when law enforcement brought a suspect back to the Wing Stop shortly thereafter, the suspect had the same clothing, except he was no longer wearing the grey shirt or dark bandana. Mr. Nugent testified the individual who robbed them was a black male, noting "[h]e wasn't really black like dark, dark at that point. Probably closer to the lighter side, without getting into like a [C]rest whitening strip thing, I guess." He also stated he fully believed the individual arrested and brought back to the Wing Stop was the individual who committed the robbery as he "saw the shoes, the pants, the boxers, and about the same height."

Mr. Nugent agreed it seemed the robbery suspect knew there should have been a female employee present, based on his repeated demands to know where she was. Mr. Nugent noted he was certain the suspect brought back to the Wing Stop that night was the person who robbed the restaurant, but did not remember if he told police that during his video interview, stating "[d]o I recall seeing that

7

individual come back wearing the same clothes, yes; but I do not know about the video to be honest."

The state's next witness was Darren Marcantel, another Wing Stop patron at the time of the robbery. Mr. Marcantel gave the same basic sequence of events as the other witnesses. He said that he and his friends were eating, Ms. Miller shouted they were being robbed, then an individual entered, took out a gun and robbed them of their cellphones. He also recounted the individual was trying to force the cash register open. Mr. Marcantel stated when he picked up his head there was a bullet "like right by [his] head and that's about it."

Mr. Marcantel described the individual as around six feet tall with skin that was "like a caramel color," average sized and wearing a grey shirt, jeans, Timberland like tan, steel-toed work boots and a bandana over his face. Mr. Marcantel testified he believed the individual law enforcement brought back to the Wing Stop that night was the same person based on "[t]he shoes, the pants, and the skin color."

Mr. Marcantel stated he thought his memory was better at trial than it was the night of the robbery because he was nervous at the time. After reviewing his statement to law enforcement the night of the robbery, Mr. Marcantel acknowledged "[he] said dark skin, and then [he] said kind of dark but not completely dark." He then claimed he doesn't distinguish between shades of color for African Americans, stating "No, everybody's the same."

The state then called Corporal Tony Ryan Magee, a seven-year veteran of the Lake Charles Police Department. Corporal Magee testified he was approximately two blocks from the Wing Stop when the robbery call came over the radio and he quickly responded. He testified that as he exited his vehicle, the robbery suspect exited the restaurant and pointed his weapon at Corporal Magee.

8

At that point, Corporal Magee fired a shot at the suspect, who ran west along the front of the building. Corporal Magee stated he took cover behind his vehicle and fired three more shots at the fleeing suspect. Noting the suspect fled south, Corporal Magee radioed the suspect's description and began pursuing the suspect; other officers established a perimeter in the area and the defendant was "apprehended coming out on Ryan Street." Corporal Magee testified that as he pursued the suspect south, Corporal Russell informed him he saw the suspect flee between a fence and a house going southbound, still armed. Corporal Magee recounted pursuing the suspect to 3007 June Street, where an occupant of the house told law enforcement someone was on his roof. Officers responding to the call established a perimeter around the area, including Ryan Street.

Corporal Magee testified that he recognized the individual who was arrested on Ryan Street shortly thereafter as the individual he saw fleeing the Wing Stop upon his arrival, noting:

> He had the same pants on, same boots on. They were a Timberland-type boot. He had scratches all over his arms and hands from jumping fences. That's something normal whenever a suspect flees from us. They get their hands cut up and scrapes and bruises. He was sweating profusely. He had taken his shirt off and taken the mask off and obviously he didn't have any evidence on him, no gun, none of that, anything like that; but everything else, his body type, his skin tone, it was 100 percent him.

Corporal Magee also testified that he specifically noted in his report the suspect was a "light-skinned black male." Corporal Magee acknowledged that he did not specify in his written report that he identified the individual arrested in part because of the scratches or because he was sweating profusely.

The state then called Detective John Russell, a seventeen-year veteran of the Lake Charles City Police Department. Detective Russell described arriving on the scene shortly after Corporal Magee, noting he heard shots being fired as he arrived.

9

Detective Russell testified he headed down and set up his car on the intersection of June Street and Lucille Street as part of the effort to establish a perimeter. He also stated he eventually did a "walk and track" with Officer Fontenot, one of the department's canine officers at the time. They located a gun and multiple cell phones taken during the robbery in an abandoned shed behind one of the homes in the 3000 block of June Street.

Corporal Dustin Fontenot, a fourteen-year veteran of the Lake Charles Police Department, testified to his involvement in the case. Corporal Fontenot testified the perimeter was already established between Ryan Street and June Street when he arrived. Corporal Fontenot testified he was with Sergeant Wall, who used her unit's PA system to announce multiple times that they were going to send in a dog to find and bite the suspect if he did not come out, at which point officers radioed in that an individual entered Ryan Street from behind the businesses and was subsequently identified as the robbery suspect.

Following the identification of the suspect, Corporal Fontenot took his canine through the neighborhood, where he was attracted to a shed behind 3003 June Street and they subsequently located "a series of objects, which appeared to be some cell phones, a wallet, and a gun sticking out of the ground, and also there was a blue item."

Officer Roland Castille, a three-year veteran of the Sulphur Police Department who previously spent "just under a year" with the Lake Charles Police Department, testified that he was in the field training program on the night of the robbery. Officer Castille testified that he was training with Corporal Hampton on the night of the robbery and Corporal Hampton was driving. Officer Castille noted he and Corporal Hampton set up in the parking lot of Rhinestone Runway, a business south of the 3000 block of Ryan Street. Officer Castille noted he looked

10

back at Corporal Hampton briefly and then looked back to see a black male come from behind the building heading south on Ryan Street. Officer Castille testified he and Corporal Hampton began following the suspect, who noticed them behind him and picked up his pace before they apprehended him.

Officer Castille testified that when they apprehended the individual "he was kind of getting belligerent." He noted the individual was sweaty "and it looked like he had run through like a briar patch or he had vegetation on him." Officer Castille noted the suspect was breathing heavily but was not sure if it was simply because he was being belligerent. Officer Castille acknowledged that his written report stated the suspect complied with all commands given to him.

Corporal David Hampton, a twelve-year veteran of the Lake Charles Police Department was the state's next witness. Corporal Hampton corroborated Officer Castille's testimony, stating they were on foot in the parking lot of Rhinestone Runway as part of the perimeter. Corporal Hampton testified the suspect was sweating profusely when they stopped him, he had small cuts or scratches on his arms, and his pulse was racing. Corporal Hampton acknowledged he did not note the sweating, scratches, or racing pulse in his report, but testified he did not go into great detail because it was simply a supplemental report.

Detective Larry Newingham, a fourteen-year veteran of the Lake Charles Police Department, took the stand next. Detective Newingham recounted receiving a 911 call in reference to someone being on the roof of a house near the Wing Stop during the search for the robbery suspect. He noted he got on top of the house the following day and noticed what appeared to be smudges and foot prints on the roof.

The state then called Colby Thompson, a retired eighteen-year veteran of the Lake Charles Police Department who retired as a homicide detective. Mr.

11

Thompson stated he assisted Detective Franklin Fondel and the evidence technician in recovering evidence. Mr. Thompson also testified he recovered a grey t-shirt and some gloves from behind Rhinestone Runway the following day, once there was enough light to search. He also noted they found an area where a person had been sleeping nearby, which turned out to be a homeless man. Mr. Thompson identified the grey t-shirt which was recovered, which had human feces on it. Mr. Thompson did not recall if the shirt was short-sleeved, long-sleeved, or sleeveless.

Lieutenant David Streva, a twenty-five-year veteran of the Lake Charles Police Department, took the stand next. Lieutenant Streva testified that he was in charge of the evidence room, and he identified a blue baby burp cloth recovered in conjunction with this case. He also identified a Lorcin .380 handgun. Lieutenant Streva testified the wallet and cell phones recovered were photographed and released to the individuals from whom they were stolen.

The state next called Christopher Singletary, a forensic DNA analyst from the Southwest Louisiana Crime Lab. Mr. Singletary was accepted as an expert in forensic DNA analysis. Mr. Singletary noted they tested gloves recovered in this case, which contained DNA from too many individuals to determine who the donors were. He also indicated the swabs from the roof did not contain enough information to make a comparison. Mr. Singletary also testified there were multiple contributors on the handgun which could not be interpreted, but they were able to identify a major contributor for the shirt that was recovered. The major contributor was matched to a Mr. Arthur Mayberry, the homeless man who slept behind Rhinestone Runway; the lab was unable to get a DNA profile for the minor contributor.

Mr. Singletary acknowledged he used a buccal swab from the defendant to create a DNA profile to use for comparison. He also acknowledged he did not

12

initially test the grey shirt, noting the lab was publicly funded and could not simply test everything that was submitted to them. Mr. Singletary testified the defendant was not the major contributor on the shirt, but he could not make a comparison between the defendant and the minor contributor as there was not enough material to get a reliable profile of the minor contributor. He further clarified that, aside from excluding the defendant as the major contributor for the shirt, he could not exclude the possibility that the defendant's DNA was on the other items tested.

The state then called Sergeant Franklin Fondel, a nearly twenty-year veteran of the Lake Charles Police Department. Sergeant Fondel testified that he was deployed to the Wing Stop around 12:30 a.m. on September 27, 2013, by his supervisor Lieutenant Anders with the task of handling the robbery investigation. Sergeant Fondel confirmed the defendant was the individual stopped on Ryan Street and subsequently identified by the witnesses as the individual who robbed the restaurant. Sergeant Fondel then identified the defendant in open court. He also noted that he attempted to interview the defendant around 4:45 a.m., but the defendant stated he did not want to make a statement but then began talking about the incident. Video of the interaction was introduced as State's Exhibit 63 and played for the jury. The video is roughly five minutes long and showed the defendant stating he was just walking down the street, asking how he could be charged with armed robbery for walking down the street, and inquiring about bond.

Sergeant Fondel testified regarding multiple photographs of the defendant taken immediately after the video, some of which show cuts to the defendant's arms and forehead that Sergeant Fondel described as fresh. Sergeant Fondel testified that following the Southwest Louisiana Crime Lab's discovery of Arthur Mayberry's DNA on the grey shirt, they learned that Mr. Mayberry was homeless and was living on the streets near the Wing Stop. He noted Mr. Mayberry told

13

them he would often use shirts or other cloth that he found to clean himself when he used the bathroom. Sergeant Fondel identified State's Exhibit 2 as a picture of Mr. Mayberry, all five witnesses testified he was not the individual who robbed the Wing Stop. He also noted that the defendant gave his home address as a residence in Westlake.

Sergeant Fondel acknowledged that he had seen cuts similar to those the defendant had on him on people involved in a domestic dispute. He also noted that the defendant did not initially mention a domestic dispute, nor did law enforcement have any reports of a domestic dispute involving the defendant on September 26, 2013. Called back as a rebuttal witness during the defendant's case in chief, Sergeant Fondel acknowledged the absence of a domestic violence report does not always mean there was no incident.

Ms. Nora Mayes, the defendant's grandmother, took the stand on the defendant's behalf. Ms. Mayes, who lives at the Westlake address the defendant gave law enforcement when he was arrested, testified the defendant was not living with her in September of 2013. She testified, however, most of her seventeen grandchildren use her address as a permanent address. She testified the defendant has never lived with her.

The defendant then took the stand to defend himself. The defendant testified he had minor traffic tickets and a pending misdemeanor public intoxication charge in Georgia. He then acknowledged he also had two misdemeanor convictions for possession of marijuana. The defendant testified that he was employed as a scaffold builder at the time of the robbery. He stated he worked on the day of the robbery but got off early because of rain around 5:00 p.m. The defendant stated he was living with the mother of his one-year old child at the time off of Hazel Street which is near the Wing Stop.

14

The defendant acknowledged he was the individual arrested on Ryan Street shortly after the Wing Stop was robbed, but testified he was simply walking around trying to cool off after he and his child's mother got into an argument and physical altercation. The defendant gave a lengthy description of the route he was walking, which included him walking south on Ryan Street for a good distance before looping back and returning to Ryan Street just south of the Wing Stop, but on the opposite side of the street. The defendant noted he has extensive tattoos on his left arm that would be plainly visible if he was wearing a short-sleeved shirt. He also acknowledged that his skin had gotten lighter during the four years he has been in Calcasieu Correctional Center awaiting trial, but that he was not significantly lighter.

The defendant testified that after seeing a heavy law enforcement presence at the Wing Stop, he crossed the intersection back to the side of Ryan Street on which the Wing Stop is located and started walking away from the restaurant because he "didn't want to get caught up in that nonsense or whatever." He testified he was on a street or sidewalk the entire time he was walking. The defendant also acknowledged that he has been charged with battery on a correctional officer since he has been incarcerated.

On cross-examination, the defendant acknowledged there might have also been a separate simple battery charge while he was incarcerated. The defendant disputed a historical weather report that indicated there was no precipitation on the day of the robbery or the subsequent day, maintaining he was sent home early from work because of light rain. He testified that his girlfriend at the time had scratched him. The defendant acknowledged multiple additional misdemeanor convictions including contributing to the delinquency of a minor and additional possession of marijuana charges. The state asked the defendant if the night of the robbery was

15

"the first time [he] had ever been shot at by cops," to which the defendant responded, "Yes, sir."

The defendant argued that Officer Castille and Corporal Hampton were wrong when they stated they saw him come onto Ryan Street from behind Rhinestone Runway; the defendant contends he crossed Ryan Street from the opposite side at an intersection further north and started walking south before the officers stopped him. He stated the officers "had to be" making it up when they announced on the radio that they saw him exit from behind the bridal store. The defendant continued to testify that he never came out from behind Rhinestone Runway, that he walked onto Ryan Street further north and on the opposite side of the street and law enforcement was lying about where they saw him when they arrested him.

## ASSIGNMENT OF ERROR

In his sole assignment of error, the defendant contends that his convictions should be overturned because the state failed to sufficiently prove he was the individual who committed the crimes in question. Because the defendant only challenges the state's proof of his identity as the individual who robbed the Wing Stop, we will only address that element. The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*,

16

436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Louisiana law requires the state "to negate any reasonable probability of misidentification" when the key issue in a case is the defendant's identity. *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051 (citing *State v. Weary*, 03-3067 (La. 4/24/06), 931 So.2d 297, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002)). However, "[p]ositive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations." *Id.* (citations omitted).

There is no question that the defendant was the individual arrested on Ryan Street shortly after the robbery in question occurred, as he admitted during his own testimony. All five of the witnesses who were present in the Wing Stop when the restaurant was robbed identified the individual arrested as the individual who committed the robbery. Additionally, Corporal Magee confirmed the individual arrested was the suspect he shot at upon arrival at the Wing Stop. Accordingly, six different witnesses identified the defendant as the perpetrator of the armed robbery, although none of them identified the defendant in open court. As noted, Louisiana courts have long held that a single witness's identification is sufficient to sustain a conviction.

The defendant contests the validity of the eye-witnesses' identifications based upon their descriptions of the perpetrator as "dark" while describing the defendant as "light;" the failure of any of the witnesses to note tattoos on the

robber's arms, as the defendant has multiple tattoos that he argues would be visible on his left arm if he had robbed the restaurant while wearing a short-sleeved t-shirt; and the fact that none of the witnesses made a "facial identification" of the defendant. This argument lacks merit.

The fact is numerous witnesses positively identified the defendant as the individual who robbed the restaurant on the night of the robbery. All five witnesses in the restaurant, as well as Officer Magee, were positive the person arrested the night of the robbery was the actual robber. Additionally, the defendant's answers on cross-examination at least insinuate he was present at the time of the robbery. On cross-examination, the following exchange occurred:

Q.     On the night of this incident was that the first time you had ever been shot at by cops?

A.     Yes, sir.

The evidence adduced at trial indicates the only person at whom law enforcement shot that night was the perpetrator of the armed robbery, as Corporal Magee fired multiple shots as the suspect fled the scene. Accordingly, the defendant's testimony on cross-examination could be viewed as an admission that he was present during the armed robbery. Indeed, the state began its closing argument with that very assertion.

Finally, the defendant's testimony regarding his activities on the night of the robbery was uncorroborated and directly contradicted by the testimony of Officer Castille and Corporal Hampton. Although the defendant contended he entered Ryan Street on the opposite side of the street from the Wing Stop, both officers testified they observed the defendant come onto the street from behind Rhinestone Runway, which is on the same side of the street as the Wing Stop. Additionally, the defendant was arrested just south of Rhinestone Runway.

18

All of this information was placed before the jury, which was tasked with deciding how much credibility, if any, to give to each witness's testimony. As noted by the supreme court in *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005), "[t]he trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" The jury was aware of witnesses' statements that initially identified the individual who robbed them as dark-skinned but then all identified the defendant as that individual. Admittedly, none of the witnesses made an in-court identification of the defendant as the perpetrator; however, all of them stated the individual arrested on the night of the robbery was the correct person and that person was the defendant. The jury heard the defendant agree the night of the robbery was the first time a cop had shot at him. The jury heard the defendant's testimony about where he was walking, which contradicted the testimony of Officer Castille and Corporal Hampton. With all this information before them, the jury returned unanimous convictions on all but one count.

The defendant's argument does little more than ask this court to override the jury's determination the witnesses, who were all confident the individual arrested shortly after the robbery (the defendant) was the perpetrator of the robbery, were credible. In light of *Higgins* and *Hughes*, there is no basis for overruling the credibility determinations made by the jury. Under the *Jackson* standard, in the light most favorable to the prosecution, the state provided sufficient evidence for a rational trier of fact to find the defendant to be the perpetrator of the Wing Stop robbery and, thus, to find him guilty of all charges arising therefrom. Accordingly, the defendant's convictions are affirmed.

19

## CONCLUSION

This court affirms the defendant's convictions. We vacate the sentences imposed for the convictions of the armed robbery with a use of a firearm and attempted armed robbery with use of a firearm and remand to the trial court for resentencing in accordance with La.R.S. 14:27, 14:64, and 14:64.3. The trial court should clearly set forth the portion of the sentence enhanced under La.R.S. 14:64.3.

**CONVICTIONS AFFIRMED; SENTENCES VACATED AND REMANDED FOR RESENTENCING.**