STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2023 KA 1060

STATE OF LOUISIANA

VERSUS

LOUIS HOWARD

JUN 0 3 2024

JUDGMENT RENDERED: _____

* * * * * * *

Appealed from the Nineteenth Judicial District Court
Parish of East Baton Rouge • State of Louisiana
Docket Number 07-18-0223 • Section 8

The Honorable Tiffany Foxworth-Roberts, Presiding Judge

* * * * * * *

| | |
|---|---|
| Yigal Bander | COUNSEL FOR APPELLANT |
| Frank W. Breaux | DEFENDANT—Louis Howard |
| M. Connor McCain | |
| Baton Rouge, Louisiana | |
| | |
| Hillar C. Moore, III | COUNSEL FOR APPELLEE |
| *District Attorney* | State of Louisiana |
| Allison Miller Rutzen | |
| *Assistant District Attorney* | |
| Baton Rouge, Louisiana | |

* * * * * * *

BEFORE: WELCH, WOLFE, AND STROMBERG, JJ.

**WELCH, J.**

The Grand Jury of the Parish of East Baton Rouge, State of Louisiana charged the defendant, Louis Howard, by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. The defendant pled not guilty. Following a jury trial, a unanimous jury convicted the defendant as charged. The trial court denied the defendant's motion for post-verdict judgment of acquittal or, alternatively, motion for new trial. Thereafter, the trial court sentenced the defendant to the mandatory term of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. See La. R.S. 14:30.1(B). The defendant now appeals, raising two assignments of error—the evidence was legally insufficient to prove his guilt beyond a reasonable doubt; and the trial court abused its discretion in admitting prejudicial "other acts" evidence under La. C.E. art. 412.4. For the following reasons, we affirm the defendant's conviction and sentence.

## FACTS

The victim, Bianca Queen, was found deceased in her home on Annette Street in Baton Rouge, Louisiana on March 17, 2018. Queen had been stabbed seven times and shot in the face once. The defendant, Queen's live-in boyfriend and the father of her eighteen-month-old son, was questioned by police and arrested for second degree murder later that same day.

## ASSIGNMENT OF ERROR ONE

In his first assignment of error, the defendant asserts the evidence was insufficient to find him guilty of second-degree murder beyond a reasonable doubt. Specifically, he claims there was no direct evidence of his guilt, and the circumstantial evidence introduced at trial failed to exclude his reasonable hypothesis of innocence that he was misidentified as the perpetrator.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review

2

for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); **State v. Coleman**, 2021-0870 (La. App. 1 Cir. 4/8/22), 342 So.3d 7, 11, writ denied, 2022-00759 (La. 11/21/23), 373 So.3d 460; see also La. C.Cr.P. art. 821(B). When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. **State v. Hearold**, 603 So.2d 731, 734 (La. 1992). When addressing the sufficiency of the evidence, consideration must be given to the entirety of the evidence, including inadmissible evidence which was erroneously admitted, to determine whether the evidence is sufficient to support the conviction. **Id.**

When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test for evaluating the evidence; rather, all of the evidence, both direct and circumstantial, must be sufficient under **Jackson** to convince a rational juror the defendant is guilty beyond a reasonable doubt. **State v. Cabellero**, 2022-0441 (La. App. 1 Cir. 11/4/22), 356 So.3d 389, 394, writ denied, 2022-01777 (La. 4/25/23), 359 So.3d 982. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Captville**, 448 So.2d 676, 680 (La. 1984); **State v. Bessie**, 2021-1117 (La. App. 1 Cir. 4/8/22), 342 So.3d 17, 22, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

3

Second degree murder is defined, in pertinent part, as "the killing of a human being...[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. **Coleman**, 342 So.3d at 12; see also **State v. Draughn**, 2005-1825 (La. 1/17/07), 950 So.2d 583, 592-93, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). Specific intent is an ultimate conclusion to be resolved by the factfinder. **Coleman**, 342 So.3d at 12.

The State bears the burden of proving the elements of the offense, along with the burden of proving the defendant's identity as the perpetrator. **Draughn**, 950 So.2d at 593. When, as in this case, the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. **State v. Hughes**, 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051. A positive identification by only one witness is sufficient to support a conviction. **Bessie**, 342 So.3d at 23.

Catherine Dukes, Queen's aunt, had last seen Queen on March 16, 2018. Queen went to Dukes' daughter's house at approximately 9:00 p.m. and left around 10:45 p.m. Dukes said that while Queen was there, the defendant called her once, which Queen's cell phone records confirmed. According to Dukes, Queen's demeanor changed when she received the phone call from the defendant.

Carol Tackno, Queen's mother, testified that Queen was in a relationship with the defendant for two to three years. Tackno lived across the street from Queen and the defendant, and she saw Queen every day. Queen had two children at the time of her death—eighteen-month-old Traylon and seven-year-old Montavia. When

Tackno did not hear from Queen on March 17, 2018, she called the defendant to ask if he had talked to her, but he stated he had been unable to reach Queen on the phone. The defendant informed Tackno that he brought Traylon to his mother's house in Port Allen, which Tackno testified was unusual. To her knowledge, the defendant had never brought Traylon to his mother's house because Queen and the defendant's mother did not get along. Thereafter, Tackno went to Queen's house, entered through her unlocked front door, and found Queen deceased, lying face down on the kitchen floor. Tackno called 9-1-1 at 4:50 p.m. Additionally, Tackno testified about an incident between Queen and the defendant that occurred approximately eleven months prior to the murder wherein Tackno witnessed the defendant hit Queen with a cell phone, causing Queen's head to bleed.

Detective Saundra Watts was assigned to the homicide division of the Baton Rouge Police Department and was the lead detective on the case. Detective Watts testified that upon arriving at the crime scene, she collected several broken knife blades and knife handles from the kitchen floor and thereafter submitted the evidence to the crime lab. She further testified that items of monetary value, such as Queen's cell phone, wallet, purse, and television, were still present in the house. There were no signs of forced entry other than an open window in the back bedroom. Detective Watts testified that when the defendant and Traylon arrived on the scene at her request, she observed suspected blood on Traylon's shirt. According to Detective Watts, the house was located in a high crime area.

A uniform patrol officer transported the defendant to the Violent Crimes Unit office located at the Louisiana State Police Compound for questioning. After being advised of and waiving his **Miranda**[1] rights, the defendant provided a statement to

---

[1] Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. **Miranda v. Arizona**, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

the police, which was played for the jury during the trial. According to the defendant, he had been dating Queen for about five years. He claimed that at the time of her death, they were "on good terms;" however, the defendant later admitted to having been physical with Queen in the past. The defendant was questioned about an incident in November 2017 where Queen claimed the defendant stood behind her vehicle, kicked the vehicle, and spat on it. The defendant indicated that Queen's family believed he was the one who killed her, but he denied any involvement. The defendant said that he left the house with Traylon to go to his mother's house around 1:00 a.m., and it took him between twenty to thirty minutes to drive there. He claimed that when he left the house, Queen was "full of life." When asked why he would bring his young child to his mother's house at that time of night without packing extra clothes, the defendant said that his mother wanted to see Traylon. He told the police that his and Queen's house was located in a bad neighborhood and that he regularly heard gunshots. During the interview, the defendant repeatedly concealed his arms and hands inside his shirt. Detective Watts testified she thought the defendant was trying to hide them. Detective Watts asked to see the defendant's hands and thereafter observed a cut on one hand.[2] When the defendant was then left alone in the interview room, he could be seen examining his fingernails, and a clicking noise could be heard. Detective Watts testified that when she watched the recording, it appeared to her that the defendant was "plucking his fingernails off." The defendant was arrested for Queen's murder at the conclusion of the interview.

During the investigation, Detective Watts reviewed cell phone records and learned that a 9-1-1 call was made from Queen's cell phone at 12:24 a.m. on March 17, 2018.[3] After that call, there were no more outgoing calls made from Queen's

---

[2] The cut is not obvious on the video recording.

[3] The 9-1-1 call lasted only a few seconds before the phone was disconnected, and it is unclear exactly what was said during those few seconds. Two voices can be heard during the call—Queen's voice and the voice of an unidentified man. In closing arguments, the State theorized Queen said,

phone. Approximately ten minutes later, at 12:36 a.m., the defendant called his mother. The defendant's mother called him at 12:50 a.m., talked with him for approximately fifteen minutes, and called again at 1:06 a.m. Then, at 2:49 a.m., the defendant again called his mother, though he told Detective Watts that he was at his mother's house at that point. The defendant tried calling Queen at 7:51 a.m. and 8:34 a.m. the next morning. Detective Watts testified the cell phone records and the defendant's timeline indicated to her that he was not honest in his interview.

Dr. William "Beau" Clark, the coroner of East Baton Rouge Parish was qualified at trial as an expert in emergency medicine. Dr. Clark testified about his determination of Queen's cause and manner of death based on the autopsy performed by a deputy coroner. According to the autopsy report, Queen suffered seven stab wounds to the forehead, right temporal scalp, right side of her neck, right side of her chest, right forearm, right thigh, and left side of her lower jaw, as well as a gunshot wound to the left side of the face. In examining the stab wounds to her right thigh, two pieces of a broken knife blade were recovered from her pelvic bone. Dr. Clark concluded the gun was fired over two feet away from Queen because there was no soot, stippling, or muzzle imprint on the entrance wound. Dr. Clark said that the wounds on Queen's hands were indicative of a struggle and could be considered defensive wounds. Toxicology analysis revealed alprazolam, hydrocodone, and oxycodone in Queen's system, though the levels were low enough for Dr. Clark to categorize as normal prescribed levels. Dr. Clark testified that it was medically impossible to determine the precise time of Queen's death.

Ashley Cook, a forensic DNA analyst with the Louisiana State Police Crime Lab, was qualified as an expert in DNA analysis. Cook explained that DNA can be obtained from skin cells, saliva, blood, semen, and hair. She testified that blood has

---

"He got a gun. My one-year-old in here." The defense disputed the State's interpretation of what was said during that 9-1-1 call.

a higher concentration of DNA than skin cells. Cook analyzed evidence submitted in this case and determined that DNA found on the handle of a knife recovered from the crime scene was consistent with DNA from both Queen and the defendant. However, Cook testified she would expect to find an individual's DNA on a knife in that person's house if that individual had touched the knife. Cook testified there was additional DNA present on the knife inconsistent with the DNA profile of either Queen or the defendant. The defendant could not be excluded as the major contributor of DNA collected from a presumptive blood stain on Traylon's shirt. Regarding the presumptive blood on a piece of drywall taken from the crime scene, Cook testified the defendant and Queen could not be excluded as contributors of the DNA. Cook explained the mixture of DNA was indistinguishable, meaning the two donors of the DNA profile potentially left behind the same amount of DNA.

On appeal, the defendant argues the case rested largely on circumstantial evidence, and the State failed to exclude every reasonable hypothesis of innocence. He contends the evidence—specifically, the open window in the bedroom and the possible presence of someone else's DNA on one of the knives—showed someone else could have broken into the house and killed Queen. The defendant argues no rational trier of fact could have found the State proved the essential elements of second-degree murder and the defendant's identity as the perpetrator beyond a reasonable doubt.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. **State v. Dunn**, 2021-0630 (La. App. 1 Cir. 12/22/21), 340 So.3d 77, 85, writ denied, 2022-00095 (La. 4/5/22), 335 So.3d 834. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence

to overturn a factfinder's determination of guilt. **State v. Taylor**, 97-2261 (La. App. 1 Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. **Dunn**, 340 So.3d at 85.

In finding the defendant guilty, it is clear the jury rejected the defendant's theory that he was misidentified as the perpetrator of the murder. His claim that someone broke into the house and killed Queen is disputed by the lack of forced entry (other than the open window) and the fact that monetary items were still present in the home, including a television, a laptop, a gaming system, two pairs of Air Jordan tennis shoes, and Queen's wallet, purse, and cell phone.

Based on the record before us, we find the jury could have reasonably accepted the testimony of any of the State's witnesses establishing the defendant was the perpetrator and rejected the defendant's claim of misidentification. Though the defendant did not testify at trial, the jury watched his recorded interview with Detective Watts wherein he claimed Queen was "full of life" when he left the house with their eighteen-month-old son at 1:00 a.m. on March 17, 2018. However, the evidence showed Queen dialed 9-1-1 at 12:24 a.m. and a man's voice can be heard in the background before the call disconnected. At 12:36 a.m., the defendant called his mother. The defendant's mother called him at 12:50 a.m., talked with him for about fifteen minutes, and then called him again at 1:06 a.m. The defendant said he left his house at 1:00 a.m. and that it took about twenty to thirty minutes to get to his mother's house. Nearly two hours later, at 2:49 a.m., the defendant again called his mother even though he claimed that he was at her house. The State presented meticulous evidence showing the timeline of the defendant's actions during the hours following Queen's 9-1-1 call. This evidence wholly undermined the defendant's claim that Queen was still alive when he left the house. Thus, we find

that the jury reasonably rejected the defendant's hypothesis that an alternative perpetrator killed Queen.

Additionally, the jury could have rationally concluded the defendant was the perpetrator based on the presence of a fresh cut on the defendant's hand when he was interviewed the day of Queen's murder coupled with the defensive wounds on Queen's hands and the broken knives found on the kitchen floor and lodged in Queen's pelvic bone. In the video recording of the defendant's statement, the defendant could be seen repeatedly trying to hide his hands and also tear off his fingernails, which the jury could have reasonably inferred was an attempt to conceal and remove evidence of his involvement in the crime. Moreover, suspected blood was found on Traylon's shirt which matched the defendant's DNA profile. The defendant admitted that he did not pack clothes for his son despite his intention to stay the night at his mother's house, and Queen's mother said to her knowledge, the defendant had never previously brought Traylon to his mother's house.

The jury heard all of the testimony and viewed all of the evidence presented at trial and found the defendant guilty as charged. The defendant's hypothesis of innocence on appeal is that someone else killed Queen, which is the same argument rejected by the jury at trial. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the State proved beyond a reasonable doubt the defendant's identity as the perpetrator of the offense and all of the elements of second-degree murder. This assignment of error is without merit.

# ASSIGNMENT OF ERROR TWO

In his second assignment of error, the defendant argues the trial court abused its discretion in allowing the State to introduce evidence of other acts pursuant to La. C.E. art. 412.4, as the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

On October 25, 2021, the State filed a "Supplemental Notice of Intention to Introduce Article 412.4 C.E. Evidence" relating to an incident between the defendant and Queen that occurred on April 30, 2017.[4] Following a **Prieur**[5] hearing on November 2, 2021, the trial court granted the State's motion. The trial court found that: (1) the defendant and Queen were household members or dating partners; (2) the incident involved abusive behavior; (3) the incident was not overly remote; and (4) the evidence was highly relevant. Further, the trial court found the evidence was substantially more probative than prejudicial, noting the evidence established the volatile relationship between the defendant and Queen and established an escalation of the defendant's violence. At trial, Tackno testified that she witnessed an altercation between the defendant and Queen on April 30, 2017, after the defendant went through the contents of Queen's cell phone. Tackno said the defendant grabbed Queen and hit her on the head with the cell phone. The State offered, filed, and introduced and published to the jury a 9-1-1 call made by Queen after the incident and several photographs depicting her head injuries.

---

[4] The State's first notice of intent to introduce "Article 412.4 C.E. Evidence" pertained to the November 2017 incident that the defendant referred to in his police interview. The defendant does not assign error to the trial court's ruling allowing that evidence to be admitted.

[5] In **State v. Prieur**, 277 So.2d 126 (La. 1973), the Louisiana Supreme Court set forth the procedures to be followed when the State intends to offer evidence of criminal offense other than those for which the defendant is being prosecuted. See also La. C.Cr.P. art. 720. The purpose of the **Prieur** hearing is to offer the defendant an opportunity to defend against the admission of "other crimes" evidence. **State v. Baker**, 452 So.2d 737, 743 (La. App. 1 Cir. 1984). The trial court must determine, outside the presence of the jury, whether the evidence complies with the standards for allowing the introduction of such evidence. Great discretion is afforded to the trial court in this area. See **State v. Lindsey**, 404 So.2d 466 (La. 1981).

Generally, evidence of other crimes committed by a defendant is inadmissible at trial due to substantial risk of grave prejudice to the defendant. **State v. Hicks**, 2022-0350 (La. App. 1 Cir. 11/4/22), 354 So.3d 715, 718, <u>writ denied</u>, 2022-01749 (La. 4/12/23), 359 So.3d 29. Such evidence, however, may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule when it tends to prove a material issue and has independent relevance other than showing that the defendant is of bad character. **Id**. <u>See</u> La. C.E. art. 404(B)(1). One exception is set forth in La. C.E. art. 412.4, which provides in pertinent part:

> A. When an accused is charged with a crime involving abusive behavior against a family member, household member, or dating partner . . . evidence of the accused's commission of another crime, wrong, or act involving assaultive behavior against a family member, household member, or dating partner . . . may be admissible and may be considered for its bearing on any matter to which it is relevant, subject to the balancing test provided in Article 403.

The admissibility of evidence under La. C.E. art. 412.4 is not limited to those actions that are identical or similar in nature to the charged crime. **Hicks**, 354 So.3d at 719. Evidence of prior acts of domestic abuse is admissible if relevant and the probative value outweighs the prejudicial effect. **Id**. As used in this balancing test, prejudice limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. **Id**. Remoteness in time, in most cases, is only one factor to be considered when determining whether the probative value of the evidence outweighs its prejudicial effect. A lapse in time goes to the weight of the evidence, rather than to its admissibility. **State v. Germany**, 2021-1614 (La. App. 1 Cir. 9/26/22), 353 So.3d 804, 821, <u>writ denied</u>, 2022-01568 (La. 1/11/23), 352 So.3d 983.

The burden is on the defendant to show that he was prejudiced by the admission of other crimes evidence. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not

12

be disturbed. This same standard is applied to the rulings on the admission of other acts evidence under La. C.E. art. 412.4. **Hicks**, 354 So.3d at 719.

On appeal, the defendant concedes Queen was a household member or dating partner; the incident involved assaultive behavior; the incident was not overly remote; and evidence of the incident was relevant to "some limited degree under La. [C.E.] art. 412.4." However, the defendant argues the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under La. C.E. art. 403. While acknowledging the action of hitting Queen on the head with a cell phone was reprehensible, the defendant questions whether evidence of that action made it significantly more likely that he was the individual who stabbed and shot Queen.

We find the trial court did not abuse its discretion in admitting the evidence. The defendant was charged with fatally stabbing and shooting a dating partner or household member, and the probative value of the evidence of the April 2017 incident was not outweighed by the danger of unfair prejudice. See La. C.E. arts. 412.4 and 403. Additionally, any prejudice from evidence showing that approximately eleven months before the instant offense, the defendant engaged in assaultive behavior against Queen, was outweighed by the probative value of the evidence on the issues of motive, opportunity, intent, absence of mistake or accident, and identity. See La. C.E. art. 404(B)(1). Evidence of the incident tended to prove a material fact at issue—*i.e.*, whether or not the defendant acted with the specific intent to kill Queen—and to rebut his defense of misidentification. See **Hicks**, 354 So.3d at 719. Therefore, we find this assignment of error to be without merit.

## PATENT ERROR

Pursuant to La. C.Cr.P. art. 920(2), this court routinely conducts a review of all appeals for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. **State v. Anthony**, 2023-0117

(La. App. 1 Cir. 11/3/23), 378 So.3d 766, 775, writ denied, 2024-00027 (La. 5/21/24), ___ So.3d ___, 2024 WL 2284735. After a careful review of the record, we have found one patent error.

The transcript reflects that after the trial court imposed the defendant's sentence, the trial court advised the defendant that he had "two years from the date that your conviction becomes final to seek post[-]conviction relief."[6] The prescriptive period for filing an application for post-conviction relief is two years after the judgment of conviction *and sentence* becomes final under the provisions of La. C.Cr.P. arts. 914 or 922. See La. C.Cr.P. art. 930.8(A); **State v. LeBoeuf**, 2006-0153 (La. App. 1 Cir. 9/15/06), 943 So.2d 1134, 1142, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Nevertheless, the trial court's failure to correctly advise the defendant of the prescriptive period has no bearing on his sentence and is not grounds to reverse the sentence or remand for resentencing. Out of an abundance of caution and in the interest of judicial economy, we note for the record and advise the defendant La. C.Cr.P. art. 930.8(A) generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. C.Cr.P. arts. 914 or 922. See **LeBoeuf**, 943 So.2d at 1143.

## DECREE

For the foregoing reasons, the defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**

---

[6] The minutes, however, reflect that the trial court correctly advised the defendant he had "two years from the finality of the judgment of conviction and sentence" to seek post-conviction relief. When there is a discrepancy between the minutes and the transcript, the transcript prevails. **State v. Lynch**, 441 So.2d 732, 734 (La. 1983).