**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**24-547**

**STATE OF LOUISIANA**

**VERSUS**

**KENDALL D. SINGLETON**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 2850-19
HONORABLE D. JASON MECHE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CHARLES G. FITZGERALD**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Charles G. Fitzgerald, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

**CONVICTION AFFIRMED;**
**REMANDED WITH INSTRUCTIONS.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**600 Jefferson Street, Suite 903**
**Lafayette, Louisiana 70501**
**(337) 366-8994**
**Counsel for Defendant/Appellant:**
         **Kendall D. Singleton**

**Chad Patrick Pitre**
**District Attorney**
**Alisa Ardoin Gothreaux**
**Assistant District Attorney**
**Twenty-Seventh Judicial District**
**Post Office Box 1968**
**Opelousas, Louisiana 70571**
**(337) 654-0935**
**Counsel for Appellee:**
         **State of Louisiana**

**FITZGERALD, Judge.**

Defendant, Kendall D. Singleton, appeals his conviction for second degree murder.

In June 2019, Joseph Stanley Boxie Jr. was shot ten times with a modified AK-47 assault rifle. He died at the scene. Four months later, Defendant was charged by bill of information with second degree murder. Then, in March 2022, a supplemental bill of information added the charge of domestic abuse aggravated battery.

Trial began in May 2024. At the close of evidence, a unanimous jury found Defendant guilty of second degree murder. Defendant was then sentenced to life in prison at hard labor without benefit of probation, parole, or suspension of sentence.

Defendant now appeals his conviction, asserting two assignments of error:

I.   The State failed to sufficiently prove that Kendall Singleton was the person who killed Joseph Stanley Boxie, and thus was guilty of second-degree murder.

II.  The trial court erred in overruling the Defense's hearsay objection to Sgt. Harris' testimony about the specific allegations of non-testifying witnesses.

## LAW AND ANALYSIS

### I.   Errors Patent

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record. Our review reveals one error patent. The error concerns the charge of domestic abuse aggravated battery: that charge remains pending in the trial court. In other words, the jury returned a verdict only as to second degree murder.

Louisiana Code of Criminal Procedure Article 819 states that "[i]f there is more than one count in an indictment, the jury must find a verdict as to each count,

unless it cannot agree on a verdict as to a count." Additionally, in *State v. Hypolite*, 04-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381, a different panel of this court addressed the same error patent. There, the court explained:

> Seven of the counts charged in the bill of information have not been properly disposed of. . . . At trial, the clerk read only count one, armed robbery, and the jury returned a verdict as to that count only. This court submitted an information request asking for "[a]ny motion, minute entry, order or amended bill concerning the disposition of Counts 2-8 charged in the Bill of Information. . . ." In response, the Deputy Clerk of Court for Iberia Parish submitted an affidavit stating that she had examined the record and had not found an amended bill of information. Therefore, the record before this court contains no evidence that counts two through eight have been disposed of.

*Id*. at 1277. The court then remanded the case for a proper disposition of counts two through eight.

Based on the above, we will remand this matter for a proper disposition of the remaining charge of domestic abuse aggravated battery.

## II. First Assignment of Error

Defendant's first assignment challenges the sufficiency of the State's evidence to support the conviction of second degree murder.

A sufficiency-of-the-evidence challenge is reviewed on appeal under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521.

2

Thus, the appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. The reviewing court must instead afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id.* at 626.

Additionally, when the key issue in a case is the defendant's identity, the prosecution must "negate any reasonable probability of misidentification[.]" *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051. However, "[p]ositive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations." *Id.* (citations omitted).

### *Summary of the Record Evidence*

The State's first witness was Jude Moreau, the director of the St. Landry Parish 911 center. In conjunction with his testimony, a flash drive containing the 911 call about the shooting of Joseph Boxie was admitted into evidence and played for the jury. Moreau testified that the 911 call was received on June 16, 2019, at 2:59 a.m. The call was made by Dawn Lewis, but she died before trial.

The State's next witness was Paul Boxie, who was related to Joseph. Paul testified that Joseph and Dawn were engaged and lived together in Opelousas at the time of the murder. Paul recalled that during the hours leading up to the shooting, he and Joseph and their mutual friend Brian Williams were hanging out at a small

3

club in Sunset, celebrating a classmate's birthday. Joseph had given Brian a ride to the club. Paul, however, was in his own vehicle. Paul explained that the club was not busy while they were there. He denied that there was any kind of trouble, fights, or arguments that night, noting that he did not see anything that could have led to the shooting.

Paul then recalled that the party wound down when the club closed at 2:00 a.m. He and Joseph exited the club, but Brian remained inside. Paul then decided to drive back to his home in Lafayette. During this drive, Joseph called him and they talked for a bit. Then, upon arriving at his home, he received a phone call from Mary. She told him that Joseph had been shot. He estimated that this call came about thirty minutes after he had left the club.

Brian testified next. He confirmed that Joseph had driven him to and from the club that night. He noted that he only lived about a block away from the club and that Joseph dropped him off at about 2:16 a.m.

The State's next witness was Sergeant Brandon Harris of the Opelousas Police Department. In conjunction with his testimony, several video recordings were introduced into evidence. These recordings show where Joseph went after he dropped Brian off at his home. For example, video footage from Go-Bears Truck Stop and Casino in Grand Coteau shows Joseph arriving at 2:22 a.m. That footage shows no one following him in or out of the casino. Then, video footage from Papillion's Grocery in Opelousas shows Joseph driving by at 2:50 a.m. Papillion's Grocery is located near Joseph's home. And that footage also shows no one following him.

Sergeant Harris was also the lead investigator in this matter. He testified that he was called to the crime scene at Joseph's home in the early hours of June 16,

4

2019. He arrived at approximately 3:20 a.m. He was then briefed by officers already there. He noticed that the crime scene had been secured. He also noticed that a high number of spent bullet casings had been collected. Once the coroner arrived, Sergeant Harris turned his attention to Joseph's vehicle. Joseph was found sitting in an upright position in the driver's seat with gunshot wounds to the left side of his body. There was also projectile damage inside the vehicle, including entry damage to the front driver side door and exit penetration damage to the rear passenger side door. The sergeant also noticed a significant amount of blood inside the vehicle.

While still at the crime scene, Sergeant Harris talked with David Boxie, who was also related to Joseph. David informed the sergeant that Joseph had had an affair with a woman named Mary Savoie and that Mary was involved with a dangerous guy from New Orleans, though David did not know the man's name. This man was later identified as Defendant. Mary and Defendant were married at the time of the shooting.

Sergeant Harris testified that before he left the crime scene, he also spoke to a neighbor whose last name was Forbes. Mr. Forbes told Sergeant Harris that immediately after the shooting, he saw a black man wearing brown pants enter the front passenger seat of a light-colored vehicle which drove away in an eastbound direction. Mr. Forbes died before trial.

The day after the shooting, Sergeant Harris spoke with Joseph's fiancée, Dawn Lewis. She confirmed Joseph's affair with Mary. Joseph's sisters, Tonette Thibodeaux and Angela Boxie, also confirmed the affair. According to Angela, about one year before the shooting, there was an altercation between Dawn and Mary over the affair. And Mary even admitted having the affair.

5

According to Sergeant Harris, a break in the case came when David informed him that Jonathan Major was near the crime scene at the time of the shooting. Sergeant Harris then met with Jonathan, who detailed what he had observed. Jonathan also testified at trial.

Jonathan testified that he lived in the same general area as Joseph. According to Jonathan, he arrived in Opelousas early in the morning on June 16, 2019. He was returning from Oklahoma, where he worked as a welder, operator, and bricklayer depending on the job. Upon arriving in Opelousas between midnight and 1:00 a.m., Jonathan claimed that he went to visit his kids and his mother. When he was subsequently asked why he was visiting his mother so late, Jonathan explained that he visits his mother whenever he can because she has significant health issues due to a recent stroke. After this visit, he set off in the direction of the Ma'jiks store, which is located off Louisiana Highway 749. Joseph claimed that he turned his bright lights on because the store had very poor lighting.

According to Jonathan, as he was travelling east and passing Joseph's house at about ten to fifteen miles per hour, he noticed a white car parked on the right side of the road facing west toward his vehicle. He recalled that the vehicle had its interior lights turned on. He noted that the combination of the interior lights, his slow speed, and his bright headlights allowed him to see two people in the car: a man and a woman. Jonathan testified that he got a better look at the person in the passenger seat, a black male. Jonathan recalled that a few seconds after passing this vehicle, he stopped at a nearby red light—about one hundred yards away—when he heard gunshots. Jonathan glanced in his review mirror and thought he saw a figure running toward and then entering the white vehicle. Jonathan did not see anything else and drove away once the stoplight turned green.

6

During the investigation, Jonathan identified Defendant from a photo lineup as the man in the white car. Jonathan also identified Defendant in open court. Jonathan confirmed that he had never seen Defendant before June 16, 2019.

Police subsequently arrested Defendant on July 5, 2019, at the residence that he shared with his wife, Mary. During the search of Defendant's residence, police found an AK-47 assault rifle, which had been modified in a "Drako" style, in the bottom dresser drawer of the master bedroom. At trial, Steven Richardson, a forensic chemist and firearms examiner with the Acadiana Crime Lab, explained that Drako style meant that the gun's shoulder stock was removed, and the weapon was fitted with a pistol grip so that it could be wielded like a pistol rather than a conventional rifle. Richardson testified that the spent shell casings collected at the crime scene were ultimately matched to this AK-47.

Following Defendant's arrest, Sergeant Harris and two other officers returned to Defendant's residence to interview Mary. Sergeant Harris testified that Mary admitted that she was parked outside of Joseph's house at the time of his murder, that she was driving a white Camry at that time, that Defendant was a passenger in the vehicle, and that Defendant was wearing a black shirt and brown pants. Mary also provided the police with the brown pants that Defendant had been wearing at the time of the shooting, noting that they had not been washed.

Defendant's pants were then sent to the Acadiana Crime Lab where they were processed by forensic specialists Jeremy Dubois and Bethany Harris. Both Dubois and Harris provided expert testimony about the DNA evidence that was collected. Dubois identified Joseph as the main DNA source from the blood stains found on the pants. Harris confirmed this result. Harris also testified about the AK-47. She found Defendant's DNA on the trigger guard and magazine releases of that weapon.

7

***Sufficiency of the Evidence—Second Degree Murder***

Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]"

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592–93, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007).

As previously stated, Defendant challenges the sufficiency of the State's evidence to support a conviction for second degree murder. Defendant specifically argues that the evidence was insufficient to prove that he was the shooter. We disagree.

To summarize, the decedent, Joseph, had an affair with Defendant's wife. Defendant's wife admitted that she was parked outside of Joseph's house at the time of the shooting, that she was driving a white Camry at that time, and that Defendant was a passenger in the vehicle. Jonathan also placed Defendant at the crime scene, and he identified Defendant in open court. The murder weapon was found during a search of Defendant's residence. And the bloodstains on Defendant's pants contained Joseph's DNA.

It was the jury's prerogative to assess the credibility of the witnesses and to accept or reject, in whole or in part, their testimony. We will not second-guess the jury's credibility determinations, nor will we impinge on its role as factfinder. Defense counsel examined the witnesses and brought to the jury's attention the

defense's position on the witnesses' credibility. But in the end, the jury believed the witnesses' testimony about Defendant's involvement in Joseph's murder.

Defendant nevertheless argues that the evidence was insufficient to support his conviction because the evidence consisted largely of circumstantial evidence. The same issue was addressed in *State v. Baumberger*, 15-1056 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017). In that case, a different panel of this court provided the following statement of law:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*Id.* at 826–27.

Here, Defendant does not assert any alternative hypothesis of innocence. But even if Defendant's arguments rose to that level, the jury obviously rejected such arguments based on its finding of guilt.

In sum, we conclude that a rational trier of fact, in viewing the evidence in the light most favorable to the prosecution, could have found that all reasonable hypotheses of innocence were excluded. And in viewing the evidence in this same light, we also conclude that a rational trier of fact could have found proof beyond a

9

reasonable doubt that Defendant was guilty of second degree murder. Defendant's conviction is therefore affirmed.

## III.    Second Assignment of Error

Defendant next asserts that the trial court abused its discretion when it did not exclude the hearsay portions of Sergeant Harris's testimony. Specifically, Defendant focuses on Sergeant Harris's testimony about statements made by Mr. Forbes. Mr. Forbes died before trial.

The State, on the other hand, argues that Defendant failed to contemporaneously object to this testimony. The State cites La.Code Crim.P. art. 841, which provides in relevant part:

> A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.

In addition, La.Code Evid. art. 103 provides that an error may not be predicated on a ruling which admits or excludes evidence unless "a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground for objection[.]"

The contemporaneous objection rule was addressed in *State v. Ruiz*, 06-1755 (La. 4/11/07), 955 So.2d 81. There, the supreme court explained:

> Louisiana's contemporaneous objection rule provides "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." La.Code Crim. Pro. art. 841 A; *State v. Knott*, 05-2252, p. 2 (La. 5/5/06), 928 So.2d 534, 535. The contemporaneous objection rule has two purposes: (1) to require counsel to call an error to the judge's attention at a time when the judge may correct the error; and (2) to prevent defense counsel from "sitting on" an error and gambling unsuccessfully on the verdict, and later resorting to appeal on an error that might have been corrected at trial.

*Knott*, 05-2252 p. 2, 928 So.2d at 535; *State v. Arvie*, 505 So.2d 44, 47 (La.1987).

*Id*. at 87.

Although a contemporaneous objection must generally be made immediately, there are instances when objections made shortly thereafter will be considered timely. *State v. Williams*, 03-1773 (La.App. 3 Cir. 6/2/04), 878 So.2d 765. But when the objection is separated from the statement by substantial amounts of testimony, courtroom breaks, significant time gaps, or many pages of transcript, the objection will be considered untimely. *Id.*

In this case, Defendant did eventually object to Sergeant Harris's hearsay testimony, but the objection came during an in-chamber conference the following day, after hours of testimony, after sixty pages of trial transcript, and after at least one courtroom break. Hence, the objection was untimely.

Defendant's second assignment of error is also without merit.

### DISPOSITION

Defendant's conviction for second degree murder is affirmed. This case is remanded to the trial court for a proper disposition of the remaining charge of domestic abuse aggravated assault.

**CONVICTION AFFIRMED;**
**REMANDED WITH INSTRUCTIONS.**